The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 27, 2021

**2021COA73**

**No. 19CA2016, *Amada Family v. Pomeroy* — Real Property —**

**After-acquired Interests — Easements**

A division of the court of appeals considers whether Colorado's after-acquired interest statute, section 38-30-104, C.R.S. 2020, abrogates the common law after-acquired interest doctrine, and if it does not, whether easements may be transferred pursuant to common law. Based on the plain language and legislative history of the statute, the division concludes that the after-acquired interest statute does not abrogate the common law doctrine and easements are among the property interests that may be conveyed under it.

The division further considers whether, in addition to conferring a right of access, an easement that arises by necessity may confer a right to install utility lines. The division determines that, especially where property is conveyed for residential use, the

need for utilities is foreseeable and an easement by necessity can include utility rights.

COLORADO COURT OF APPEALS                    **2021COA73**

Court of Appeals No. 19CA2016
Montrose County District Court No. 18CV30063
Honorable Mary E. Deganhart, Judge

Amada Family Limited Partnership,

Plaintiff-Appellee and Cross-Appellant,

v.

Eugene K. Pomeroy and Michelle M. Pomeroy,

Defendants-Appellants and Cross-Appellees.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE RICHMAN
Lipinsky and Pawar, JJ., concur

Announced May 27, 2021

Brian Kidnay, PC, Brian Kidnay, Montrose, Colorado; Timmins LLC, Edward P.
Timmins, Amy K. Hunt, Denver, Colorado, for Plaintiff-Appellee and Cross-
Appellant

Masters Law Firm, P.C., David Masters, Montrose, Colorado, for Defendants-
Appellants and Cross-Appellees

¶ 1     Defendants, Eugene K. Pomeroy and Michelle M. Pomeroy (the Pomeroys), appeal a district court's judgment in favor of plaintiff, Amada Family Limited Partnership (Amada). Amada cross-appeals the district court's determination that it is not entitled to damages for trespass. We affirm the judgment insofar as the district court recognized easements in favor of Amada and the Pomeroys and established their scope and location. We reverse the judgment insofar as the district court determined that the Pomeroys could not have trespassed on Amada's easement and denied Amada damages. We remand this case for a hearing on Amada's trespass claim.

## I.     Background

¶ 2     Through a series of transactions with Michael and Virginia McGee (the McGees), Amada purchased two parcels of land near Montrose, Colorado, referred to as Parcel A and Parcel D. Because the land to the east of Parcels A and D is impassable, these parcels lack any feasible means of ingress and egress except across two parcels now owned by the Pomeroys, referred to as Parcel B and Parcel C. The four parcels are located as shown below:



¶ 3     Amada asserts that it owns an express access and utility easement over Parcels B and C in favor of Parcel A and an implied access and utility easement over Parcels B and C in favor of Parcel D.  When these easements are pieced together, they provide Amada access to and from Uncompahgre Road, the public road to the west of the four parcels, and permit it to develop its land for residential use.  The Pomeroys dispute Amada's easement claims.  They concede only that Amada has an express access and utility easement over Parcel B (but not over Parcel C) in favor of Parcel A.  To resolve the issues raised, we must examine the history of Parcels A through D.

## A.    Transactional and Procedural History

¶ 4    The McGees acquired Parcels A and B in 2003.  In connection with the sale, they received a right-of-way permit (the permit) from the federal government, which owned Parcels C and D at the time. The permit, issued by the Bureau of Land Management (BLM), allowed the McGees to enter and exit their property on an access road (the access road) that began at Uncompahgre Road, traveled north through Parcel B to Parcel C, then turned south, reentering Parcel B near the McGees' residence.

¶ 5    In 2006, the McGees decided to sell Parcel A.  To facilitate the sale, they procured an amendment to the permit.  The amendment allowed the owner of Parcel A to create a new "spur" road north of the existing access road.  The spur road was intended to permit the owner of Parcel A to access that parcel without driving near the McGees' residence on Parcel B.

¶ 6    In September 2007, by warranty deed (the 2007 deed), the McGees sold Parcel A to Amada.  The deed granted Amada an easement (the 2007 easement) as follows:

> Grantor hereby grants to Grantee a 50 foot non-exclusive easement for ingress, egress and utilities, extending by the most direct and

drivable route to the Property from Uncompahgre Road.  This grant of [a] non-exclusive easement shall include the ground currently used and permitted for access under a permit issued by the Bureau of Land Management (BLM), if and when Grantor or its successors shall acquire title to said ground.  It is mutually understood that no present Grant of [an] easement can be made across ground not currently owned by Grantor and that Grantor shall have no duty to provide alternative access while Grantee has legal access under said permit from the BLM. . . .

Grantor and/or Grantor's heirs and/or assigns shall allow a 50 foot easement for ingress, egress and utilities to the benefit of the Grantee or Grantee's heirs and/or assigns *in the event Grantor acquires property from the Government that Grantees['] and Grantors['] current road is on* that goes between Uncompahgre Road and Grantees['] and Grantors['] property.

(Emphasis added.)  Thereafter, Amada used the existing access road to access Parcel A as specified in the 2007 deed.

¶ 7     In December 2012, the federal government conveyed Parcels C and D to the McGees.  Thereafter, when Virginia McGee wanted to access Parcel D, she generally crossed Parcels B and C on the access road driving an all-terrain vehicle.  Then, she crossed Parcel A with Amada's permission, using a trail on Parcel A to drive to Parcel D.

4

¶ 8    In June 2014, the McGees sold Parcel D to Amada.  According to Mark Covington, the agent who assisted the parties in negotiating the sale of Parcel A and Parcel D, the parties understood that the 2007 easement would extend to Parcel D because the easement was already being used to access Parcel A and the "title didn't show lack of a right-of-access, so we went with that."  The deed to Parcel D did not mention the 2007 easement, but Covington testified that the parties expected Amada to use the access road to get to Parcel D.

¶ 9    In July 2014, the McGees sold Parcels B and C to the Pomeroys.  After the sale, Amada continued to use the access road as it had before.

¶ 10    In 2017, Amada built the planned spur road and began using it to access its parcels.  The spur road connects to the access road on Parcel C and passes through an elk fence on Parcel C that was installed, without the government's permission, by a person who owned Parcels A and B before the McGees owned them.  To clarify the issues surrounding the spur road, we have drawn lines on the parcel map that roughly illustrate the manner in which the access

road (the solid line) and the spur road (the dotted line) intersect with a portion of the elk fence (the dashed line).



¶ 11    After Amada built the spur road, and without Amada's consent, the Pomeroys placed a gate across the spur road where it runs through a hole Amada made in the elk fence.  The Pomeroys also locked a gate at the entrance to the access road, effectively denying Amada access to its parcels.  They subsequently took the position that Amada held no easements of any kind.  In response, Amada filed an action for declaratory judgment and trespass.

¶ 12    The Pomeroys counterclaimed seeking, among other things, a declaratory judgment in their favor as to Amada's claimed easements and legal recognition of an easement on Parcel A in favor of Parcels B and C.  The Pomeroys argued that an easement on

Parcel A is necessary because it allows them to access a headgate, located on Parcel A, that is essential to their irrigation system (the headgate easement).

### B. Easements Over Parcels B and C to Parcel A

¶ 13    Before trial, Amada filed a motion for partial summary judgment. It argued that, under the 2007 deed, it owns an express access and utility easement over Parcel B in favor of Parcel A. It further argued that under the after-acquired interest statute, *see* § 38-30-104, C.R.S. 2020, as applied to the 2007 deed, when the McGees acquired Parcel C in 2012, Amada acquired an express easement over Parcel C in favor of Parcel A. Finally, Amada asserted that it owns an implied access and utility easement across Parcels B and C in favor of Parcel D based on necessity and the McGees' prior use of the access road to reach Parcel D.[1]

¶ 14    In a thorough written order, the district court concluded that when the McGees sold Parcel A to Amada in 2007, Amada obtained

---

[1] Amada additionally claimed, in the alternative, an implied easement by pre-existing use over Parcels B and C in favor of Parcel A. The district court denied this claim and Amada does not appeal this portion of the judgment. Therefore, we do not address it.

an express access and utility easement over Parcel B in favor of Parcel A. It further concluded that, in 2012, under the common law after-acquired interest doctrine, Amada obtained an express access and utility easement over Parcel C in favor of Parcel A. However, genuine issues of material fact remained with respect to the implied easement over Parcels B and C in favor of Parcel D, and the court declined to recognize the easement on summary judgment.

### C. Easements Over Parcels B and C to Parcel D

¶ 15 The parties proceeded to a bench trial regarding the existence of an implied easement in favor of Parcel D. At trial, the court also considered whether the Pomeroys committed trespass by, among other conduct, gating the spur road at the elk fence and locking a gate at the entrance to the access road. In addition, the parties asked the court to define the scope and location of any easements recognized or established.

¶ 16 In a written order, the district court concluded that Amada holds an implied access easement over Parcels B and C in favor of Parcel D based on the McGees' prior use, and an implied easement by necessity, for *access and utilities*, over Parcels B and C in favor

of Parcel D.  The court also prohibited the Pomeroys from gating the spur road at the elk fence and it denied Amada's trespass claim.

### D.    Easement Over Parcel A from Parcels B and C

¶ 17    In addition, the district court considered the Pomeroys' claim to the headgate easement.  Amada conceded the existence of the easement but expressed concern about its location and width.  The court's trial order recognized an eight-foot-wide easement over Parcel A in favor of Parcels B and C.

¶ 18    After trial, the Pomeroys filed a C.R.C.P. 59 motion to amend the judgment, asking the district court to make the headgate easement wider and to allow a gate on the spur road at the elk fence.  The court denied the motion.

### E.    Issues Appealed

¶ 19    On appeal, the Pomeroys contend that the district court erred by (1) granting an express easement over Parcel C in favor of Parcel A; (2) granting an implied easement over Parcels B and C in favor of Parcel D; (3) requiring removal of the gate on the spur road; and (4) denying their Rule 59 motion to widen the headgate easement.  On cross-appeal, Amada contends that the court erred by declining to award damages for trespass.  We address each contention in turn.

## II. The Court Properly Recognized an Easement Over Parcel C in Favor of Parcel A

¶ 20    As noted above, the express easement over Parcel C in favor of Parcel A was recognized on summary judgment. We review de novo a district court's grant of summary judgment. *Wallman v. Kelley*, 976 P.2d 330, 331 (Colo. App. 1998). To prevail on such a motion, the moving party must demonstrate that there are no genuine issues of material fact and the movant is entitled judgment as a matter of law. *Id.* at 332.

¶ 21    There are no genuine issues of material fact regarding Amada's claim to an express easement over Parcel C in favor of Parcel A because the existence of the easement hinges on the 2007 deed's granting language and the McGees' undisputed purchase of Parcel C in 2012. *Premier Bank v. Bd. of Cnty. Comm'rs*, 214 P.3d 574, 577-78 (Colo. App. 2009) (stating that interpretation of a deed is a question of law and the granting clause controls the nature of the interest conveyed).

¶ 22    However, the parties disagree as to what law applies. The district court relied exclusively on the common law after-acquired interest doctrine. The Pomeroys contend that the court erred in

this regard, urging that the after-acquired interest statute abrogated the common law doctrine. They further argue that, even if the common law doctrine survived enactment of the statute, it does not support Amada's claim.

### A.    The Statute Did Not Abrogate the Common Law

¶ 23    The parties have cited no case, and we have found none, in which a Colorado court expressly decided whether Colorado's after-acquired interest statute abrogates the common law doctrine.[2] To the extent that Colorado courts have addressed this issue, they have noted that the statute is a codification of the common law doctrine, which is generally stated as follows: "Where one conveys lands with warranty, but without title, and afterwards acquires one, his first deed works an estoppel, and passes an estate to the grantee the instant the grantor acquires his title." *Phillippi v. Leet,* 19 Colo. 246, 251-52, 35 P. 540, 541 (1893) (quoting 3 Emory

---

[2] This common law principle is also sometimes referred to as "estoppel by deed." *Shaw v. Profitt,* 110 P. 1092, 1095-96 (Or. 1910). For ease of reference, and to ensure linguistic consistency with existing case law, we will use the term "after-acquired interest" doctrine. *See Premier Bank v. Bd. of Cnty. Comm'rs,* 214 P.3d 574, 576 (Colo. App. 2009) (referring to the "after-acquired interest statute").

Washburn, *Washburn on Real Property* 118 (4th ed. 1876)); *see also*

*Premier Bank*, 214 P.3d at 579. This doctrine serves to bind the

grantor to the terms of the purported conveyance, including any

warranties made, under principles of estoppel. *Premier Bank*, 214

P.3d at 579; *Shaw v. Profitt*, 110 P. 1092, 1092 (Or. 1910) (noting

that this doctrine is grounded in equity, which will grant relief by

estoppel when there is intentional or unintentional fraud).

¶ 24    Thus, Colorado's after-acquired interest statute states that

> [i]f any person sells and conveys to another by deed or conveyance, purporting to convey an estate in fee simple absolute, any tract of land or real estate lying and being in this state, not being possessed of the legal estate or interest therein at the time of the sale and conveyance and, after such sale and conveyance, the vendor becomes possessed of and confirmed in the legal estate of the land or real estate so sold and conveyed, it shall be taken and held to be in trust and for the use of the grantee or vendee, and said conveyance shall be held and taken, and shall be as valid as if the grantor or vendor had the legal estate or interest at the time of said sale or conveyance.

§ 38-30-104.

¶ 25    One notable difference between the statute and the common

law doctrine is that the doctrine applies "[w]here one conveys *lands*

*with warranty, but without title*," *Phillippi*, 19 Colo. at 251-52, 35 P.

12

at 541 (emphasis added) (quoting Washburn at 118), while the statute applies where one purports to convey "*an estate in fee simple absolute,*" § 38-30-104 (emphasis added).

¶ 26    According to the Pomeroys, this difference in wording indicates that a grantee is entitled to an after-acquired interest *only* if the grantor originally conveyed the subject property in fee simple absolute.  They further argue that an easement is not an estate in "land or real estate" that may be conveyed in fee.  § 38-30-104.  Rather, it is a "nonpossessory property right to enter and use land in the possession of another."  *Matoush v. Lovingood*, 177 P.3d 1262, 1265 (Colo. 2008) (citation omitted).  Therefore, the argument goes, easements cannot be conveyed in fee under the statute and they cannot be conveyed as after-acquired property interests under the common law, which has been abrogated.[3]  For three reasons, we are not persuaded.

_____

[3] We need not decide whether the after-acquired interest statute applies to easements incorporated in a fee simple deed.  The district court relied on the common law doctrine, and the parties made arguments about its continued viability.  Therefore, the common law issue is squarely before us.

¶ 27    First, when interpreting a statute, our primary goal is to give effect to the legislative intent. *Premier Bank*, 214 P.3d at 577. We therefore read statutory words or phrases according to their plain meanings, being careful not to construe them in a manner that unjustifiably enlarges or diminishes their import. *Robbins v. People*, 107 P.3d 384, 387-88 (Colo. 2005). This rule informs a related principle: "[A] statute may not be construed to abrogate the common law unless such abrogation was clearly the intent of the [G]eneral [A]ssembly." *Id.* To abrogate the common law, a statute must expressly state the intention to do so or must do so by necessary implication. *City of Colorado Springs v. White*, 967 P.2d 1042, 1055 (Colo. 1988).

¶ 28    Our review of the plain language of the statute reveals that it expressly provides a statutory remedy only for parties who have received a defective conveyance in fee simple absolute. However, it is silent regarding any intent to abrogate the common law. The statute's express provision of a remedy to cure defects in fee simple estates does not preclude the survival of common law remedies. *Id.* ("A statute is merely cumulative of the common law if the legislature intended not to interfere with preexisting rights, but to give

14

additional relief."); *see also* 31 C.J.S. *Estoppel* § 26 (2021) (noting that a statute providing for transfer of after-acquired title in fee simple absolute "does not limit the application of the rule estopping a grantor to assert an after-acquired title to grants falling within the provisions of the statute, and, notwithstanding the statute, such an estoppel may arise from covenants of warranty contained in other grants.") (footnote omitted).  In our view, the General Assembly has expressed no clear intent to abrogate the common law.

¶ 29 Second, the legislative history of section 38-30-104 indicates that it was enacted to clarify an ongoing debate over which warranties are impliedly included in particular kinds of deeds. Colorado first enacted the after-acquired interest statute as a territorial ordinance in 1861.  *See Premier Bank*, 214 P.3d at 576. It has not been amended since that time.  In 1868, when the ordinance was first included in a compilation of Colorado statutes, it appeared with a footnote referencing Illinois law.  *See* R.S. 1868, Ch. 17, § 4.  As is the case with many of our statutes, it appears that Colorado's after-acquired interest statute was patterned after a statute enacted earlier in Illinois.  When Colorado adopts a statute from another state and, at the time of enactment, it has been

15

construed by an appellate court of that state, we may presume our legislature intended the statute to be construed in a similar manner. *Peters v. Smuggler-Durant Mining Corp.*, 930 P.2d 575, 578 (Colo. 1997); *Brown v. Davis,* 103 Colo. 110, 114, 83 P.2d 326, 328 (1938).

¶ 30 In *Frink v. Darst,* 14 Ill. 304, 309-10 (1853), the Supreme Court of Illinois explained the rationale behind the Illinois statute's exclusive application to estates in fee simple absolute. According to the court, the "fee simple absolute" language was included to distinguish the legal effect of deeds conveying fee simple title, which indefeasibly vest the entire estate in the grantee, from the legal effect of quitclaim deeds, which convey only the grantor's current interest and necessarily exclude transfer of subsequently acquired interests. *Id.*; *see Tuttle v. Burrows,* 852 P.2d 1314, 1316 (Colo. App. 1992) (holding that a quitclaim deed does not convey property rights that vest after conveyance).

¶ 31 Quoting language from a Missouri case interpreting a "precisely similar" statute, the Illinois court explained,

> our statute was intended to settle a question which had been much discussed, and about which there was certainly great conflict of

> opinion; whether a general warranty would operate to transfer a subsequently acquired legal title. It undoubtedly settles this question in the affirmative, and, I think, it goes further. . . . It does not limit its operation to deeds containing covenants of general warranty, but it extends to every deed which purports to convey a fee simple absolute, whether it contains a general warranty or not.[4]

*Frink,* 14 Ill. at 309-10 (quoting *Bogy v. Shoab*, 13 Mo. 365, 381 (1850)).

¶ 32     Thus, when Colorado's legislative body first adopted this statute, it did so with an understanding that the "fee simple absolute" language was meant to remove lingering uncertainty regarding whether a deed conveying an estate in fee simple absolute impliedly warranted that the estate was indefeasibly vested, even against grantors claiming after-acquired interests. Conversely, this same wording was intended to clarify that quitclaim deeds contain no implied warranties and do not convey after-acquired interests unless express warranties are made.

---

[4] A general warranty is "[a] warranty against the claims of all persons." Black's Law Dictionary (11th ed. 2019). Thus, it includes the grantor.

¶ 33     Given this history, we do not construe the statute as a limitation on common law remedies but as an answer to uncertainties surrounding the necessity of express warranties.  *See Robben v. Obering*, 279 F.2d 381, 384 (7th Cir. 1960) (concluding that the Illinois statute did not abrogate the common law but was intended to remove "uncertainty which may have existed as to whether an express warranty was required to invoke the doctrine of after-acquired title").  In fact, after passage of the statute, Illinois courts continued to enforce the common law doctrine that deeds expressly warranting title, whether they grant fee simple estates or not, are effective to transfer after-acquired interests.  *Bennett v. Waller*, 23 Ill. 97 (1859) (noting that, although the statute did not apply to a particular deed, after-acquired title passed under an express covenant in the deed); *Phelps v. Kellogg*, 15 Ill. 131, 137 (1853) (concluding that, under equitable principles, and due to an express covenant, an after-acquired property interest was transferred by quitclaim deed); *see also Aure v. Mackoff*, 93 N.W.2d 807, 812 (N.D. 1958) (noting that common law "estoppel by deed" principles were applicable to a quitclaim deed that warranted title

because the doctrine "is not limited to cases falling within our statutory provisions").

¶ 34 Third, several Colorado cases impliedly acknowledge the continued viability of the common law doctrine. *See Phillippi*, 19 Colo. at 252, 35 P. at 541-42 (recognizing an exception to the statute based on common law); *Colo. Trout Fisheries v. Welfenberg*, 84 Colo. 592, 594, 273 P. 17, 18 (1928) (noting that the after-acquired interest statute is "merely a legislative codification of the general rule and *in harmony* with the same") (emphasis added); *Bessemer Irrigating Ditch Co. v. Woolley*, 32 Colo. 437, 445-46, 76 P. 1053, 1055 (Colo. 1904) (discussing whether a habendum clause purporting to confirm in the grantee any estate specifically granted "which the grantor might thereafter acquire" can transfer after-acquired property apart from statutory protections).

¶ 35 For these reasons, we conclude that section 38-30-104 does not abrogate the common law.

### B. The Claimed Easement Was Transferred Under the Common Law Doctrine

¶ 36 Having determined that the common law doctrine remains viable, we must now consider a second question: whether the

19

easement claimed by Amada is subject to post-conveyance transfer under common law.

¶ 37     As noted above, among other possible methods, transfer of after-acquired property may occur under an implied warranty (as provided in the statute, for example).  It may also be effected through an express covenant in a contract or instrument of conveyance.  *Lobato v. Taylor*, 71 P.3d 938, 950 (Colo. 2002); *Phelps*, 15 Ill. at 137; *Bennett*, 23 Ill. at 97.  In this case, we need not concern ourselves with implied warranties because the 2007 deed expressly promises the transfer of an after-acquired easement over Parcel C.  Therefore, we need only determine the enforceability of the express covenant.

¶ 38     As we explained, *supra* Part II.A n.2, the after-acquired interest doctrine rests on principles of estoppel and is sometimes called "estoppel by deed."  The doctrine "prevents a party to a deed from denying anything recited in that deed if the party has induced another to accept or act under the deed."  *Estoppel By Deed*, Black's Law Dictionary (11th ed. 2019).  It serves to prevent fraud and honors the parties' intentions by defining their obligations according to the terms of the challenged instrument.  *See Int'l Tr.*

20

*Co. v. Palisade Light, Heat & Power Co.*, 60 Colo. 397, 401-02, 153 P. 1002, 1003 (1916); *Gyra v. Windler*, 40 Colo. 366, 369-70, 91 P. 36, 37 (1907); *Shaw*, 110 P. at 1094. The doctrine may be used to enforce any covenant in a deed that sets forth the parties' obligations. *Int'l Tr.*, 60 Colo. at 401-02, 153 P. at 1003.

¶ 39 As the district court noted, courts in other states have concluded that easements may be transferred as after-acquired property under principles of estoppel or estoppel by deed. *Noronha v. Stewart*, 245 Cal. Rptr. 94, 96 (Ct. App. 1988) (noting that a grantor that purports to convey any property interest, including oral easements, is estopped to deny its transfer); *Arnold Indus., Inc. v. Love*, 63 P.3d 721, 726-27 (Utah 2002) ("To allow a grantor to deny the terms of its conveyance after acquiring title by repudiating an easement originally intended to be granted would be an invitation to fraud and would contravene the central purpose of the equitable doctrine of estoppel by deed."); *see also Sprinkle v. Am. Mobilephone Paging, Inc.*, 525 So. 2d 1353, 1356-57 (Ala. 1988) (concluding that the defendant grantor was bound to his grant of an easement under the after-acquired interest doctrine because this result honored the intent of the parties); *Spencer v. Wiegert*, 117 So. 2d 221, 226 (Fla.

21

Dist. Ct. App. 1959) ("Easements constitute property within the rule of estoppel as to after-acquired property.").

¶ 40     Nevertheless, the Pomeroys insist that *Noronha* and *Arnold,* on which the district court relied, do not support Amada's claim because these cases state (or imply) that, to proceed under a theory of estoppel, a grantee must have reasonably relied on a grantor's representation that he or she owned the after-acquired property.[5]

---

[5] Amada contends that we should not consider this issue because the Pomeroys did not preserve it.  We disagree.  The Pomeroys had no opportunity to raise the issue because Amada did not make arguments based on the common law doctrine until it replied to the Pomeroys' response to its motion for summary judgment.  Although we normally do not consider unpreserved issues in civil cases, *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 2016 COA 178, ¶ 11, here, we elect to do so.  The district court's ruling was based on common law.  Although the Pomeroys did not make these arguments below, the court had an opportunity to rule on the applicability of the common law doctrine.  *Id.*  Further, principles of judicial economy and fairness weigh in favor of granting review. *Flagstaff Enter. Constr., Inc. v. Snow,* 908 P.2d 1183, 1185 (Colo. App. 1995) (noting the unfairness of making a new argument in a reply brief in the district court); *Farmer v. Colo. Parks & Wildlife Comm'n*, 2016 COA 120, ¶ 19 (stating that court has discretion to review unpreserved issues of law where they have been fully briefed); *see also Rinker v. Colina-Lee,* 2019 COA 45, ¶¶ 24-26 (holding that, where a trial court rules on an issue without giving all parties an opportunity to be heard, the merits of the ruling are subject to appellate review even in the absence of a timely objection).

Logically, a grantee cannot rely on this representation when the grantee had notice that, at the time of the conveyance, the grantor's title was defective or nonexistent. *Noronha*, 245 Cal. Rptr. at 97 (noting that estoppel does not apply in favor of a grantee who has notice that the grantor does not own the property conveyed); *Arnold*, 63 P.3d at 726-27 (considering whether a grantee's reliance was reasonable when the defective grant was a matter of public record).

¶ 41     It is true that a party generally has no right to invoke principles of estoppel unless that party reasonably relied on the grantor's representation. *See Lobato*, 71 P.3d at 950-51 (stating that an easement may be created by estoppel where the claimant substantially changed position in reliance on the conduct of the grantor); *Alexander v. McClellan*, 56 P.3d 102, 106 (Colo. App. 2002) ("Estoppel requires that a person, by words, by conduct, or by silence when he or she has a duty to speak, induce another to change position detrimentally in reasonable reliance on his or her actions." (quoting *Cont'l W. Ins. Co. v. Jim's Hardwood Floor Co.*, 12 P.3d 824, 828 (Colo. App. 2008))). Nonetheless, a covenant "will always work an estoppel to the extent of its terms," Washburn at 110, so reliance should be evaluated according to the terms of the

covenant at issue. *See also Premier Bank*, 214 P.3d at 579 (noting that the after-acquired interest statute, which is in harmony with the common law, binds grantor to the terms of the conveyance).

¶ 42    The terms of the covenant in 2007 deed were that, although the McGees didn't own Parcel C at the time, the easement would include the land currently permitted for access if the McGees acquired that land. The covenant also compelled the grantors and their assigns to "allow a 50 foot easement for ingress, egress and utilities to the benefit of the Grantee . . . in the event Grantor acquires property [incorporating the current access road] from the Government." Based on that understanding, Amada acquired Parcel A, from which no feasible means of access exists without the easement over Parcel C. It therefore reasonably relied on the McGees' promise to allow an easement over Parcel C if they could acquire it.[6] The district court did not err by recognizing the claimed easement.

---

[6] Similar covenants promising transfer of after-acquired interests have been given effect in Illinois. *E.g.*, *Bennett v. Waller*, 23 Ill. 97, 97 (1859) (upholding a covenant in a quitclaim deed promising "with all convenient speed" to obtain a patent for the premises and execute additional deeds if necessary to ensure transfer of perfect

III.    The Court Properly Recognized an Access and Utility Easement
Over Parcels B and C in favor of Parcel D

¶ 43    The Pomeroys next challenge the district court's recognition of

an implied access and utility easement over Parcels B and C in

favor of Parcel D.  They contend that the evidence did not support

the court's conclusion that the McGees' prior use of the access road

to enter Parcel D created an implied easement.  They further

contend that any implied easement arising by necessity did not

include utility rights.

¶ 44    To the extent the Pomeroys base their arguments on factual

disputes, we review for clear error.  *Campbell v. Summit Plaza*

*Assocs.*, 192 P.3d 465, 469 (Colo. App. 2008).  However, we review

any legal issues de novo.  *Id.*

A.    The Elements of an Easement by Prior Use Were Met

1.    Law

¶ 45    When not expressly conveyed, easements may arise by

implication.  *Lobato*, 71 P.3d at 950.  Colorado law recognizes

---

title); *Phelps v. Kellogg*, 15 Ill. 131, 137 (1853) (where a grantor had
only a right of preemption at the time of conveyance, but the deed
included a promise to transfer further title if it was acquired, the
court enforced the covenant to transfer after-acquired title).

25

implied easements based on a strong public policy in favor of honoring the intentions of parties and avoiding unjust results and against rendering land useless due to a lack of access. *Id.*; *Thompson v. Whinnery*, 895 P.2d 537, 540 (Colo. 1995). To that end, when a party conveys property, there is a presumption that the party has conveyed whatever is necessary to provide for its beneficial use. *Thompson*, 895 P.2d at 540; *see also Collins v. Ketter*, 719 P.2d 731, 733 (Colo. App. 1986).

¶ 46 An easement by prior use is a type of implied easement. To establish an easement by prior use, a party must show that

> 1) the servient and dominant estates were once under common ownership, 2) the rights alleged were exercised prior to the severance of the estate, 3) the use was not merely temporary, 4) the continuation of this use was reasonably necessary to the enjoyment of the parcel, and 5) a contrary intention is neither expressed nor implied.

*Lobato*, 71 P.3d at 951 (citing Restatement (Third) of Prop.: Servitudes § 1.2(2) (Am. L. Inst. 1998)).

¶ 47 The "common ownership" requirement serves to protect the ownership rights of grantors by requiring all owners of an estate to impliedly or expressly consent to the burden of an easement before

26

it can arise. *Campbell*, 192 P.3d at 472 (noting that "ownership and its attendant rights are what is important, not [arbitrary lot] divisions or identifiers"); Restatement (Third) of Prop.: Servitudes § 2.3 (Am. L. Inst. 2000); *cf. Yellowstone River, LLC v. Meriwether Land Fund I, LLC*, 264 P.3d 1065, 1079 (Mont. 2011) (stating that an implied easement may arise only "at the time of severance, because the common owner may grant or reserve an easement only over her own property" not over neighboring or intervening property).

¶ 48    Similarly, the requirement that the "use was not merely temporary" is intended to honor the owner's intent at the time of severance. Thus, to create an easement by prior use, the owner must use the premises "in [an] altered condition" long enough prior to severance to demonstrate that the owner intended the change to be permanent. *Lee v. Sch. Dist. No. R-1*, 164 Colo. 326, 331, 425 P.2d 232, 236 (1967).

### 2.    Analysis

¶ 49    The Pomeroys assert that, because the McGees conveyed Parcel A to Amada before the McGees acquired Parcels C and D, the relevant parcels were not under common ownership prior to

27

severance and no easement as to Parcel D was created. They insist that to prove common ownership, Amada was required to show the McGees owned all the parcels simultaneously and that all their land was contiguous.

¶ 50     We are not persuaded. This argument misconstrues the scope of Amada's claim. Amada's claim is that it holds an easement appurtenant to the dominant estate, Parcel D, over Parcels B and C, which are the relevant servient estates. *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1234 (Colo. 1998) (*Lazy Dog II*) (noting that servient estates are those burdened by an easement while dominant estates are those benefitted). Parcel A is not one of the servient estates that must have been under common ownership for an easement to have been created. Put differently, the parties' intent with respect to Parcel A, which was already owned by Amada at the time of severance, is not relevant to whether, at the time the ownership of Parcel D was severed from Parcels B and C, the McGees intended to permit Amada to enter Parcel D via the access or spur roads on Parcels B and C.

¶ 51     Nor is the McGees' prior use of Parcel A relevant simply because it is situated between the parcels the McGees retained at

28

the time of conveyance. Colorado follows the modern rule that an easement may be appurtenant to land even when the servient estates are not adjacent to the dominant estate. *Wagner v. Fairlamb*, 151 Colo. 481, 487, 379 P.2d 165, 169 (1963). This rule applies to implied as well as express easements. *Id.*; *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., Ltd.*, 58 P.3d 608, 617 n.7 (Haw. 2002) (noting that severance of noncontiguous properties is not fatal to recognition of an implied easement).

¶ 52 The Pomeroys further argue that the McGees' prior use of roads on Parcels B and C to access Parcel D did not endure long enough and was not apparent enough to demonstrate an intent that their use be permanent. They point to the fact that the McGees only owned Parcels B, C, and D for about eighteen months and no paved road or trail was ever constructed over Parcel A to allow the McGees to access Parcel D. Again, we are not persuaded.

¶ 53 In *Proper v. Greager*, 827 P.2d 591, 593 (Colo. App. 1992), for two years prior to severance of the subject properties, the common owner drove across a parking lot on the servient estate to reach a mobile home and shed on the dominant estate. A division of this court concluded that the owner's prior use demonstrated his use of

the premises in an altered condition long enough to create an implied easement. *Id.*

¶ 54    The facts in this case are like those in *Proper.* The McGees owned the subject parcels for eighteen months, a similar length of time. Further, Mrs. McGee testified that to get to Parcel D, she routinely took the access road over Parcels B and C (which she then owned) to Parcel A, where (with Amada's permission) she would ride her all-terrain vehicle over a trail on Parcel A to Parcel D. Thus, as in *Proper,* she used an existing road or thoroughfare on the servient estates to access her other parcel, fulfilling the requirement that the road is used in an "altered condition" by the prior owner.

¶ 55    It is of no moment that only a rough "trail" over Parcel A existed at the time Mrs. McGee used it. Any trail on Parcel A is only relevant insofar as it completes the narrative regarding the manner in which the McGees got to Parcel D. It shows, with specificity, where Mrs. McGee drove her all-terrain vehicle to get to her noncontiguous parcel. The Pomeroys have cited no case, and we have not found one, requiring that a road necessary to the common owner's prior use must be paved to make the use sufficiently apparent. This is especially so where, as here, the intent of the

parties at the time of conveyance is clear because Mrs. McGee and Covington testified that they expected Amada to access Parcel D in the same way the McGees had. The trial evidence supports the conclusion that the owners' prior use was apparent.

¶ 56 For these reasons, we conclude that the district court did not err by recognizing Amada's implied access easement over Parcels B and C in favor of Parcel D.[7]

B. An Access and Utility Easement Arose By Necessity

¶ 57 The Pomeroys' challenge to Amada's claim to an easement by necessity is narrow. In their briefs, they do not appear to argue that no easement by necessity exists over Parcels B and C in favor of Parcel D. They argue only that an easement created by necessity cannot include the right to run utilities to the dominant parcel. On this basis, they argue that the trial court erred by awarding a utility easement to Amada in favor of Parcel D. Insofar as this contention raises a purely legal issue, our review is de novo. *Campbell*, 192

---

[7] The court did not grant a utility easement based on prior use because the McGees did not install utilities when they owned Parcel D.

P.3d at 469.  To the extent the Pomeroys raise an implicit challenge to the court's evidentiary findings, we review for clear error.  *Id.*

### 1. Law

¶ 58  An easement by necessity arises when the owner of a parcel of land grants part of the land to another party, leaving either the part granted or the part retained without access except through the other part.  *Id.*  In that circumstance, as with an easement by prior use, a presumption arises that the grantor has conveyed or retained whatever is necessary to provide for the beneficial use of both properties.  *Martino v. Fleenor,* 148 Colo. 136, 140, 365 P.2d 247, 249 (1961).  If this presumption is not contradicted by the terms of the deed and the facts of a particular case, an easement by necessity will arise.  *Id.*

¶ 59  The scope of an easement by necessity depends on the purpose for which the parcel was conveyed.  *Thompson,* 895 P.2d at 541.  A parcel's purpose includes uses that would be reasonably expected based on "normal development" of the parcel.  *Id.*  "[T]he law assumes that no person intends to render property conveyed inaccessible for the purpose for which it was granted."  *Wagner,* 151 Colo. at 487, 279 P.2d at 169.  Therefore, the permissible uses of an

easement by necessity vary according to what rights are necessary to enable a grantee to use the land as intended and reasonably expected. *Id.*; *Thompson*, 895 P.2d at 541.

¶ 60 Although Colorado has not explicitly done so, several courts in other states have concluded that an easement by necessity may include utilities. Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 8.7 n.5, Westlaw (database updated Nov. 2020) (collecting cases). Support for this view is especially strong where a parcel is already in residential use or a parcel was conveyed for residential purposes, making the necessity of utility rights reasonable and foreseeable. *Reece v. Smith*, 594 S.E.2d 654, 658 (Ga. Ct. App. 2004) (granting an implied utility easement where "[t]he utilities were necessary to the reasonable enjoyment of the land as a place of residence"); *Brown v. Miller*, 95 P.3d 57, 61 (Idaho 2004) (upholding a trial court's ruling that "it is only logical [that] an easement by necessity also includes utilities"); *Smith v. Heissinger*, 745 N.E.2d 666, 671-72 (Ill. App. Ct. 2001) (concluding that easements by necessity are not limited to ingress and egress but may include utilities); *Stroda v. Joice Holdings*, 207 P.3d 223, 230 (Kan. 2009) (recognizing that an easement by

necessity included a right to utilities because the reasonable use of residential property required utility services); *Morrell v. Rice*, 622 A.2d 1156, 1160 (Me. 1993) ("An easement created by necessity can include not only the right of entry and egress, but also the right to make use of the easement for installation of utilities . . . ."). We find these cases, and the notion that foreseeable residential use reasonably includes utilities, to be persuasive. *But see Vertex Holdings, LLC v. Cranke*, 217 P.3d 120, 124 (Okla. Civ. App. 2008) (denying an easement by necessity for utilities because, at the time of severance, there was no necessity for a sewer line and nothing about the severance altered the positions of the parties).

### 2.    Analysis

¶ 61    At trial, both Amada's trustee, Gary Gustafson, and Covington testified concerning the purpose for which Parcels A and D were sold. Based upon this testimony, the trial court found "it was not a secret that [Amada] intended to utilize Parcel D for residential purposes." There is record support for this finding.

¶ 62    Covington testified that the 2014 conveyance of Parcel D was really a "continuation" of the deal between the McGees and Amada in 2007. The parties assumed that access and utility rights would

34

be the same for both parcels. He further testified that, at the time of conveyance, Parcel D had no restrictions on its use and putting a residence on Parcel D would have been part of "normal development" of the parcel.

¶ 63 Gustafson testified that when he decided to purchase Parcel A via the trust, he did so because he wanted to move to Montrose and buy land for investment. He further stated that he planned to divide Parcel A and install a road or utilities, an intention reflected in the deed to Parcel A, which provides parameters for dividing the parcels into residential lots. Gustafson also testified that he and Mr. McGee talked about their plans to split their parcels into smaller home sites. According to Gustafson, when Amada purchased Parcel D, he hoped to use that parcel as an investment property as well.

¶ 64 Negotiations for the Pomeroys' purchase of the other parcels were proceeding simultaneously with Amada's negotiations for Parcel D and the Pomeroys expressed an interest in purchasing a portion of the northwest corner of Parcel D. Based on the Pomeroys' interest in reducing the size of Parcel D, Gustafson asked that additional land be added to it to ensure that Parcel D would

include at least thirty-six acres. He insisted on this number because he wanted Parcel D to have enough acreage to comply with state and county rules setting minimum acreage standards for selling a parcel. He also contemplated putting his own residence on Parcel D, building an access road on Parcel A to Parcel D, and running utilities for both parcels under that road. It was his understanding that because the 2007 easement to Parcel A included utilities, any access easement to Parcel D would include utilities as well.

¶ 65 We conclude that because the scope of an easement by necessity is set according to the purpose of the conveyance, and the trial court found, with evidentiary support, that Parcel D was conveyed for residential purposes, the court did not err by recognizing that Amada's easement on Parcels B and C in favor of Parcel D includes utility rights.[8]

---

[8] The district court's order stated that "there was no evidence that allowing the existing easement for utilities to also benefit Parcel D would in any way further burden Parcels B and C." Therefore, utility rights are not precluded by a concern with overburdening Parcels B and C.

## IV.    The Court Did Not Err by Requiring Removal of the Gate

¶ 66    The Pomeroys next contend that the district court erred by concluding that the gate on the spur road at the elk fence must be removed because it is an unreasonable interference with Amada's easement.  Whether gates or other impediments unreasonably interfere with the rights of an easement holder is a question of fact.  *Lazy Dog Ranch v. Telluray Ranch Corp.*, 923 P.2d 313, 317 (Colo. App. 1996) (*Lazy Dog I*).  We will not disturb the district court's findings unless they are not supported by the evidence.  *Id.*

### A.    Law

¶ 67    Where, as here, an easement is not exclusive, both the owner of the dominant estate and the owner of the servient estate have a right to use the property.  Therefore, the parties' interests must be balanced.  *Lazy Dog II*, 965 P.2d at 1238.  The owner of the servient estate has a "qualified right to put his or her property to any lawful use for which it may be adapted" but "cannot unreasonably interfere with the superior right of the person possessing the easement."  *Lazy Dog I*, 923 P.2d at 316.  By contrast, the owner of the dominant estate may use the easement in any manner "reasonably necessary to permit [its] full use," but cannot

37

unreasonably interfere with the enjoyment of the servient estate. *Id.*; *Lazy Dog II*, 965 P.2d at 1238.

¶ 68    When a grant is silent regarding whether an easement may be gated, and the owner of a servient estate insists on gating the easement, his conduct may unreasonably interfere with the rights of the easement holder. *Lazy Dog I*, 923 P.2d at 316; *see also Schold v. Sawyer*, 944 P.2d 683, 685 (Colo. App. 1997). Circumstances relevant to the reasonableness of his conduct include, among other factors, "(1) the purpose for which the grant was made; (2) the intention of the parties given the circumstances surrounding the grant; (3) the nature and situation of the property; [and] (4) the manner in which the easement was used." *Lazy Dog I*, 923 P.2d at 317.

## B.    Analysis

¶ 69    The Pomeroys contend that the district court's finding was erroneous because the court improperly balanced the interests of the parties. They argue that the court gave insufficient weight to the fact that they erected a three-strand fence along the north/south border between Parcel C and Parcel A that connects with the elk fence, creating an enclosed horse pasture on Parcel C.

According to the Pomeroys, removal of the gate at the elk fence would render this space unusable as a horse pasture, denying them the full enjoyment of their estate. In addition, they assert that the court gave too much weight to Amada's future development plans because these plans are still speculative.

¶ 70 The Pomeroys did not raise potential destruction of the horse pasture during trial, focusing instead on the damage elk might cause should they enter through the opening in the fence. Because they raised the horse pasture issue for the first time in their Rule 59 motion, and the argument was based on evidence not presented at trial, the district court declined to consider it. The Pomeroys therefore failed to preserve this issue for review. *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 2016 COA 178, ¶ 11.

¶ 71 Moreover, we do not consider whether the district court gave too much weight to Amada's residential development plans, given that these plans remained speculative, or failed to give enough weight to the Pomeroys' need for a continuous elk fence. Our review is confined to determining whether the district court's findings are supported by the evidence. *Lazy Dog I*, 923 P.2d at 317. The court's order shows that it considered the factors listed in

*Lazy Dog I*: the purpose of the grant, the intentions of the parties, the "nature and situation" of the land, and the manner in which the easement was used. *Id.* It found that the expected placement of the spur road "necessitated that it pass through the elk fence," the grant's purpose was to facilitate residential use, and prior to the Pomeroys' ownership, there were no gates or impediments to access. It further noted that even when the elk fence is gated, the Pomeroys lack a complete perimeter fence because they have chosen to allow a large break in the fence where it intersects with their driveway. The record contains support for each of these findings. Accordingly, we will not disturb them on appeal. *Id.*

## V. We Decline to Address the Width of the Headgate Easement

¶ 72    The Pomeroys further argue that the district court abused its discretion by denying their Rule 59 motion to amend the judgment to widen the headgate easement. We decline to review this issue because it was not properly appealed.

¶ 73    Under C.A.R. 4(a), to preserve the right to appeal, a party in a civil case must file a notice of appeal within forty-nine days of the date the judgment is entered (although the running of the time to appeal is terminated by the filing of a Rule 59 motion). Failure to

file a timely notice of appeal deprives this court of jurisdiction, precluding review on the merits. *In re Estate of Anderson*, 727 P.2d 867, 869 (Colo. App. 1986).

¶ 74    In this case, the district court rendered judgment on September 16, 2019. The Pomeroys filed their Rule 59 motion on September 30. They then filed a notice of appeal on November 4, 2019, forty-nine days after the district court rendered judgment.[9] At that time, the trial court had not ruled on their Rule 59 motion, and it did not do so until November 25, 2019. The Pomeroys were therefore unable to appeal the denial of their Rule 59 motion when they filed their initial notice of appeal. Moreover, they did not amend the notice of appeal after the district court denied their Rule 59 motion. The time for supplementing or amending the initial notice of appeal has now expired.

¶ 75    Under these circumstances, the district court's ruling on the Rule 59 motion was not properly appealed and we have no jurisdiction to consider it. *Id.* at 870 (holding that this court lacked

---

[9] The Pomeroys' Rule 59 motion terminated the running of the time for filing a notice of appeal. C.A.R. (4)(a). Therefore, the notice of appeal was prematurely filed.

jurisdiction to review a postjudgment order where the order was not initially appealed and the notice of appeal was never supplemented).

## VI. The Court Improperly Denied Damages for Trespass

¶ 76 On cross-appeal, Amada contends that the district court erred by declining to award economic damages to remedy the Pomeroys' alleged trespass. We agree.

¶ 77 Although the import of the court's order is somewhat unclear, it appears the court determined that, with one exception not applicable here, a servient owner cannot "trespass" on an easement by placing impediments on it because the easement holder does not technically possess the land. Since no trespass may occur, no damages for trespass may be awarded, but injunctive relief is available. This ruling requires us to consider what remedies may be given for a servient estate owner's placement of impediments on an easement. We review this legal question de novo. *Campbell*, 192 P.3d at 469.

¶ 78 In making its decision, the district court largely relied on language from *Upper Platte & Beaver Canal Co. v. Riverview Commons General Improvement District*, 250 P.3d 711, 716-17 (Colo. App. 2010), wherein a division of this court considered whether the

42

Colorado Governmental Immunity Act (CGIA), §§ 24-10-101 to -120, C.R.S. 2020, barred the plaintiff's claims for declaratory, injunctive, and restorative relief against municipal authorities that made alterations to the plaintiff's easement. In that context, the *Upper Platte* division stated that "pure rules of trespass, which are founded on possessory rights, . . . do not apply to easements." 250 P.3d at 716 (quoting 1 Dan B. Dobbs, *Law of Remedies* 814 (2d ed. 1993)).

¶ 79    This statement is not applicable to the question raised here because the division cited it in connection with an attempt to construe specific statutory language in the CGIA. Moreover, in the next sentence, the *Upper Platte* division noted that whether a particular tort such as trespass is identified or not, a party that interferes with an easement may be liable for damages based on their interference. *Id.* at 717. Thus, *Upper Platte* is no bulwark against an award of damages in this case.

¶ 80    Further, in *Roaring Fork Club, L.P. v. St. Jude's Co.*, the supreme court expressly stated that an easement holder may be entitled to economic damages for trespass when the owner of the servient estate obstructs an easement. 36 P.3d 1229, 1234 (Colo.

43

2001) (concluding that the servient estate owner had trespassed on the plaintiff's easement by altering it, and, as a result, the dominant estate owner "may well be entitled to damages").

¶ 81    In *Proper*, 827 P.2d at 597, a division of this court considered whether a court can award damages based on a servient estate owner's obstruction of an easement.  It concluded that "if necessary to grant an injured party complete relief for past interference with his easement, the court may also award monetary damages."[10]  *Id.* To support its holding, the *Proper* court cited *Schmidt v. Parker Land & Cattle Co.*, 517 P.2d 870, 871-72 (Colo App. 1974) (not published pursuant to C.A.R. 35(f)), a case in which another division of this court awarded damages to an easement holder who was denied access to his land when the servient owner obstructed his easement with a locked gate.  Although the injury to the plaintiff in *Schmidt* did not include physical damages to his land or the easement, the court awarded damages for loss of the opportunity to

---

[10] The *Proper* court did not explicitly identify the defendant's installation of a fence blocking the easement as a trespass.  But the supreme court so characterized it in *Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229, 1234 (Colo. 2001).

pasture his property and loss of the property's reasonable rental value. *Id.*

¶ 82 The holdings in these cases comport with the view set forth in the Restatement (Third) of Property, which acknowledges that damages for violation of easement rights are available to an easement holder whose right of way is obstructed. Restatement (Third) of Prop.: Servitudes § 8.3 (Am. L. Inst. 2000). It states, "[f]or obstruction of an easement, damages and injunctions requiring removal of the obstruction, restoration of the easement, and prohibiting future obstruction are normally appropriate." *Id.*

¶ 83 In this case, Amada alleged that the Pomeroys committed trespass by locking the gate at the entrance to the access easement and installing a gate on the spur road at the elk fence. Gustafson testified that, to remedy the situation, he had to leave his residence in Arizona, drive to Colorado, and spend two nights in a hotel room while he sought access to his land. The Pomeroys may be liable for these damages under Colorado law.

¶ 84 We reverse the district court's judgment insofar as it concluded that the Pomeroys could not have trespassed on Amada's easement by installing or locking gates at the access and spur

roads.  We further reverse the court's ruling denying Amada damages.  We remand this case for a hearing on whether the Pomeroys' obstruction of Amada's easement constituted trespass, and if so, what damages should be awarded.

## VII.   Conclusion

¶ 85     We affirm the judgment in part, reverse it in part, and remand for a hearing on Amada's trespass claim.

JUDGE LIPINSKY and JUDGE PAWAR concur.