LAZY DOG RANCH, a New Jersey Partnership and Robert E. Grunow, Plaintiffs–Appellees,

v.

TELLURAY RANCH CORPORATION, a Colorado Corporation and Charles Ergen, Defendants–Appellants.

No. 94CA1508.

Colorado Court of Appeals, Div. II.

Feb. 1, 1996.

Rehearing Denied March 21, 1996.

Certiorari Denied Sept. 3, 1996.

Tisdel, Hockersmith & Burns, P.C., Richard P. Tisdel, Robert B. Burns, Ouray, for Plaintiffs–Appellees.

Cashen & Cheney, Robert J. Thomas, Montrose, for Defendants–Appellants.

Opinion by Judge PLANK.

Defendants, Telluray Ranch Corporation and Charles Ergen, appeal the judgment entered by the trial court allowing the placement of cattle guards on a railroad grade road and granting to plaintiffs, Lazy Dog Ranch and Robert E. Grunow, an easement of 60 feet in width along the railroad grade road. We affirm.

Harry McClure previously owned approximately 8,000 acres of land called the Pleasant Valley Ranch. The southern two-thirds of the property was divided from the northern third by an abandoned railroad grade which had been used as a road since the 1950s. The eastern end of the railroad grade road connected to a county road which formed the original boundary of McClure's property.

From the late 1960s until 1986, McClure sold approximately 1,700 acres of the northeastern-most part of the property for residential use. The majority of these properties are not part of this appeal.

In 1980, McClure sold 6 residential plots, about 40 acres each, located on the north side of the railroad grade road, to family members. However, in the center of these plots, one 30 acre parcel, called the peninsula, remained unsold. This property lies immediately north of the railroad grade road and is bounded on the west, north and east by properties which were sold to the family members.

In 1986, McClure sold 530 acres to Kenneth Vilkin predecessor in interest to plaintiffs. The property is shaped like the letter "L", tipped on its side, with the long part comprising the northern boundary, and the foot of the "L" comprising the western boundary. The property is bounded on the south and east by property owned by McClure's family; on the extreme southern boundary abutting the railroad grade road, with the property on the other side of the railroad grade road and to the west bounded by what would become defendant's property. Its only access to the county road is over the railroad grade road.

In 1990, Vilkin conveyed his property to Lois Lyon, who immediately conveyed it to plaintiff Lazy Dog Ranch Corporation, of which she is a partner. The Lazy Dog Ranch is not a working ranch, but instead was to be sold in 35 acre lots for residential purposes. One such lot has been sold to plaintiff Grunow.

In 1991, McClure's estate sold the remaining southwest portion of the Pleasant Valley Ranch, 6,200 acres, located south of the railroad grade road and the peninsula to the defendant, Telluray Ranch. The northern boundary of this property is the railroad grade road and Lazy Dog Ranch. The property also shares an east/west border with the Lazy Dog Ranch. The Telluray Ranch is a working ranch with approximately 600 head of cattle.

Until 1990 a barbed wire drift gate existed across the railroad grade road. It ran north to south from the boundary line between the property sold to family members William Noland and Frieda and Reginald Berry and into the Pleasant Valley Ranch. This gate was located between the county road and the eastern border of the peninsula.

In 1992, the plaintiffs improved the railroad grade road at a cost of $220,000. At that time the drift gate was removed and neither party replaced it. Both parties used the improved grade, although the defendants did not contribute to its cost.

In fall 1992, Telluray Ranch began fencing its boundaries, starting with the southern boundary of the railroad grade road. Plain-

tiffs paid for half of the fencing cost of the joint boundary. In late 1992 or early 1993, the peninsula was completely fenced in and the defendants placed two 16–foot gates across the railroad grade road, at the east and west boundaries of the peninsula. These gates were replaced by the defendants in April 1993 with 10–foot gates. Because the grade was wider than 10 feet, posts were placed in the middle of the road to accommodate these gates. These gates were padlocked by the defendants who provided keys to the plaintiffs.

In June 1993, the plaintiffs, at their own expense, replaced the gates with cattle guards and initiated a civil action seeking: (1) a declaratory judgment determining plaintiffs' right of access and defendants' right of access across plaintiffs' land (including roads not subject to this appeal); (2) injunctive relief prohibiting defendants from obstructing plaintiffs' deeded access; and (3) damages (later withdrawn). The trial court granted a temporary restraining order, and the parties stipulated that the cattle guards would be removed and that no cattle guards or gates would be installed pending the final resolution of the case.

Shortly before trial, the defendants leased three parcels, belonging to McClure's family members, situated immediately to the east and north of the peninsula. They then modified their request for gates, as the property leased included the location of the drift gate. Instead of gates at the borders of the peninsula, their amended pleading requested that gates be allowed at the location of the old drift gate and at the western boundary of the peninsula. The plaintiffs then amended their complaint, requesting that defendants not be allowed to place gates at any point.

After a three-day trial to the court, the trial court ordered, *inter alia*, that the plaintiffs install cattle guards at their expense in no more than two locations on the railroad grade road. If these were to be moved, the defendant would bear that expense. The defendants would be allowed to establish side gates, but would not be allowed to construct physical barriers across the railroad grade road except as temporarily necessary to move cattle. Plaintiffs were also granted a

60–foot wide easement along the railroad grade road. This appeal followed.

## I.

The defendants contend that the trial court erred in determining that they did not have the right to place one or more gates across the railroad grade road. We disagree.

## A.

▬ We first address the drift gate. Upon conflicting testimony, the trial court found that this gate and a drift fence existed until approximately 1990 and were not restored after the railroad grade road was improved as the need for it no longer existed. Sufficient evidentiary support exists for the trial court's findings; thus, we will not disturb them on appeal. *See Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979).

## B.

▬ Second, the defendants assert that the trial court erred in determining they could not erect permanent gates across the railroad grade road. We disagree.

▬ When an easement exists, so does a dichotomy of interests which must be respected and, as nearly as possible, kept in balance. On the one hand, the owner of land burdened by an easement has a qualified right to put his or her property to any lawful use for which it may be adapted. However, the servient owner cannot unreasonably interfere with the superior right of the person possessing the easement. On the other hand, the owner of an easement may do what is reasonably necessary to permit full use of the easement, but cannot expand the extent of the easement. *Osborn & Caywood Ditch Co. v. Green*, 673 P.2d 380 (Colo.App.1983).

▬ In determining the extent of an easement, the factors enunciated in *Restatement of Property* § 483 (1944) provide guidance. Those factors are: (1) the circumstances under which the conveyance was made; (2) the fact that it was or was not gratuitous; (3) the use made of the servient tenement before conveyance; and (4) the use made of the servient tenement after the conveyance. Af-

ter considering these factors, the trial court concluded that cattle guards, rather than gates, should be used in these circumstances. We perceive no error in that ruling.

A party may not extend an easement by erecting gates if the gates result in an unreasonable burden to the easement holder. *See generally Osborn & Caywood Ditch Co. v. Green, supra.* No Colorado appellate decision has addressed whether gates or cattle guards are an unreasonable burden on the possession of an easement, but several other jurisdictions have addressed this issue.

Locked gates are usually considered an unreasonable burden, even if the easement holder is provided with keys. However, they are acceptable when the deed specifically provided for gates at the entrance and exit of the easement. *Stout v. Christian,* 593 S.W.2d 146 (Tex.Civ.App. 1980). Further, cattle guards should not replace gates when the grant specifically provides for gates. *Hoffman v. Smith,* 172 W.Va. 698, 310 S.E.2d 216 (1983).

However, when the easement does not specifically call for gates, cattle guards may be acceptable under certain circumstances. *Jones v. Edwards,* 219 Or. 429, 347 P.2d 846 (1959); *Mize v. Ownby,* 189 Tenn. 207, 225 S.W.2d 33 (1949). Cattle guards serve the interests of both landowners as they keep livestock pastured without impeding the other party's right of ingress or egress and without subjecting him or her to the hazards involved in opening a gate. *Reddick v. Williams,* 260 Md. 678, 273 A.2d 153 (1971).

Further, cattle guards are an accepted method of containing cattle. *Strahan v. Bush,* 237 Mont. 265, 773 P.2d 718 (1989). There is not much difference between a gate and a cattle guard. One is erected perpendicularly and cattle will not walk through it. The other is built horizontally and cattle will not walk over it. Both achieve the same objective. *Mize v. Ownby, supra,* 225 S.W.2d at 34.

Even when cattle guards are not contemplated by the original easement, a court sitting in equity, in order to effect justice, may properly determine if they are allowable under the circumstances. *Strahan v. Bush, supra.*

Ultimately, the question whether locking gates and providing the plaintiff with keys is an unreasonable interference with the easement is a question of fact. *Stout v. Christian, supra; Webb v. Finley,* 806 S.W.2d 501 (Mo.App.1991).

Thus, when a grant is silent as to the question of gates or guards, the court should look at four factors: (1) the purpose for which the grant was made; (2) the intention of the parties given the circumstances surrounding the grant; (3) the nature and situation of the property; (4) the manner in which the easement was used. *Webb v. Finley, supra.*

Upon consideration of the case law from other jurisdictions and the *Restatement of Property,* § 483, we conclude the proper analysis should be guided by the following:

First, whether gates or cattle guards are an unreasonable interference to an easement holder is a question of fact. Thus, we shall not disturb the findings of the trial court if supported by the evidence.

Second, the factors listed in *Webb v. Finley, supra,* although non-exhaustive, provide guidance in determining what constitutes an unreasonable burden.

Third, as stated in *Restatement of Property* § 483 comment h, (1944) effecting a compromise between the parties' positions is often the best solution for an easement question.

Taking these three principles into consideration, we conclude that the trial court reached a proper resolution of the dispute. A balance had to be struck between the interests of both parties. In forming its compromise, the trial court looked at several factors, including: the historical use of the property; whether gates were present on the road at any point and their location; the effectiveness of cattle guards; the marketability of plaintiff's property with and without gates; how frequently cattle were moved across the grade; trespassers and security;

the safety of cattle; and the practicability of various types of gates.

After considering the evidence, the trial court determined that cattle guards provided a compromise which best served the interest of the parties. Since evidentiary support exists for the trial court's conclusion, we conclude that the court did not err by authorizing the cattle guards.

## II.

Lastly, the defendants contend the trial court erred in determining that plaintiff has a 60 foot wide easement along the railroad grade. Again, we disagree.

The merger doctrine provides that a buyer's acceptance of a deed tendered in performance of a contract extinguishes prior covenants in an antecedent contract relating to title, quantity, possession, or emblements of the land. However, the doctrine does not affect covenants which are not intended to be incorporated in the deed. *Skidmore v. First Bank of Minneapolis,* 773 P.2d 587 (Colo. App.1988), *cert. denied* 790 P.2d 843 (Colo. 1990).

Further, when the width of an easement is specifically set forth in the grant, the express terms control. *Pickens v. Kemper,* 847 P.2d 648 (Colo.App.1993).

Here, the contract for sale between McClure and Vilkin expressly provides that "[a]ny provisions of the contract not contained in the instruments exchanged at closing shall remain fully enforceable and shall not merge therein." The pertinent provision upon which the trial court properly relied provides that: Seller grants to Buyer an access and utility easement *60 feet* in width along roads to the subject property along the old railroad .... (emphasis added). Thus, as the contract did not merge into the deed, the express provision for a 60–foot easement over the railroad grade road was valid.

Accordingly, the judgment is affirmed.

HUME and MARQUEZ, JJ., concur.