23CA0894 Brinkerhoff v Thurber 08-07-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0894
Douglas County District Court No. 16CV30253
Honorable Andrew C. Baum, Judge

---

William Brinkerhoff and Renee Brinkerhoff,

Plaintiffs-Appellees and Cross-Appellants,

v.

Mark Thurber and Robyne Thurber,

Defendants-Appellants and Cross-Appellees,

v.

Jefferson Park Development, LLC,

Third-Party Defendant-Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division B
Opinion by JUDGE GOMEZ
Fox and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

---

Eason Law, LLC, David R. Eason, Boulder, Colorado, for Plaintiffs-Appellees and Cross-Appellants

Anne Whalen Gill, LLC, Anne Whalen Gill, Castle Rock, Colorado; Hassan + Cables, LLC, Stewart D. Cables, John L. Skari, Jr., Boulder, Colorado, for Defendants-Appellants and Cross-Appellees

Dill Dill Carr Stonbraker & Hutchings, PC, Patrick D. Tooley, Denver, Colorado, for Third-Party Defendant-Appellee

¶ 1    Defendants, Mark and Robyne Thurber, appeal the trial court's judgment resolving their various easement disputes with their neighbors, plaintiffs William and Renee Brinkerhoff and third-party defendant Jefferson Park Development, LLC (JPD). The Brinkerhoffs cross-appeal. We affirm in part and reverse in part and remand the case to the trial court for further proceedings.

## I.    Background

¶ 2    The Brinkerhoffs and the Thurbers own adjacent parcels of property in a rural part of Douglas County. The following map shows the relevant properties and owners as of the end of 2019:



Map of the Parties' Property Boundaries as of 2019

¶ 3     Since the Brinkerhoffs purchased their initial parcel in 1994, they have used an easement that passes over the Thurbers' land, known as the Main Drive Easement, as a driveway to access their property from the public road.

¶ 4     Between 2004 to 2008, when the Brinkerhoffs were largely absent, the Thurbers constructed three gates along the Main Drive. Upon the Brinkerhoffs' return, the parties began to dispute the Brinkerhoffs' use and maintenance of the drive. The Brinkerhoffs conducted constant maintenance on the drive, like grading, road base additions, snow removal, and weed control. And, according to the Thurbers, they drove up and down the drive multiple times a day, sometimes at excessive speeds, and frequently left the gates open. The parties also disputed other claimed easements.

¶ 5     In 2011, litigation began.

¶ 6     In 2014, the parties reached a settlement agreement in the hopes of putting their disputes to rest. Under that agreement, the Brinkerhoffs would abandon the Main Drive Easement in favor of a new easement, called the Northern Drive Easement, which would pass through a different part of the Thurbers' property, as well as through part of a neighboring parcel owned by Craig and Mary

Ewing.[1]  (The existing Main Drive also went through a part of the Ewings' parcel.)

¶ 7     Because the Northern Drive Easement was to pass over their land, the Ewings' cooperation was a necessary condition to effectuate the settlement agreement.  But upon their divorce in October 2015, the Ewings partitioned their property into three parcels.  Mr. Ewing kept the northern parcel; Ms. Ewing kept the southern parcel, which was burdened by the Main Drive Easement; and the Ewings put the middle parcel, where the Northern Drive Easement was proposed to be, up for sale.  Eventually, in August of 2017, the Ewings sold the middle parcel to JPD, a limited liability company wholly owned by the Brinkerhoffs.  A couple years later, Ms. Ewing sold the southern parcel to the Thurbers.  The divorce and the eventual sale of the middle parcel called into question the ongoing necessity of the Ewings' cooperation and the overall viability of the settlement agreement.

¶ 8     In the meantime, in 2016, the Brinkerhoffs filed the underlying case seeking a declaratory judgment that the settlement

---

[1] The Ewings' property was in fact owned by the couple's retirement accounts.  But for simplicity's sake, we refer to them as the owners.

agreement was no longer viable or enforceable.  The Thurbers responded with various counterclaims.

¶ 9    In 2017, the trial court held a bench trial on the initial issue of the viability of the settlement agreement.  The court entered an order in 2018 finding that the settlement agreement was salvageable and that the condition requiring the Ewings' cooperation was moot due to JPD's purchase of the middle parcel.

¶ 10    The Thurbers later filed third-party claims against JPD.  JPD, in turn, filed a counterclaim against the Thurbers.

¶ 11    In 2022, the trial court conducted a second trial on the various issues underlying the parties' claims.  As pertinent here, in its post-trial order, the court resolved those issues as follows:

- *The Settlement Agreement and Northern Drive Easement.* Based on new evidence, the settlement agreement in fact had failed on its own and was no longer viable.  And the Northern Drive Easement was never created.  Thus, the Brinkerhoffs were not in breach of the settlement agreement, and JPD's property (the former middle Ewing parcel) wasn't burdened by the Northern Drive Easement.

- *The Pasture Easement.* The Brinkerhoffs have no interest in this claimed easement over the Thurbers' property.

- *Maintenance of the Main Drive.* The Brinkerhoffs and the Thurbers were to retain an expert or a panel of three experts (with the Brinkerhoffs and Thurbers each choosing an expert and those two experts choosing a third to serve either alone or with the other two) to provide a "binding recommendation" regarding future maintenance of the Main Drive.

- *Width of the Main Drive.* The Main Drive cannot exceed sixteen feet in width, with two-foot shoulders on each side.

- *Gates and cattle guards on the Main Drive.* The Thurbers may maintain the gates and cattle guards currently in place, subject to certain specified limitations.

- *The Thurbers' trespass and outrageous conduct claims.* The Thurbers didn't prove these claims, except as to one trespass that likely occurred when the Brinkerhoffs drove a car over a claimed easement they had no interest in, for which the Thurbers would receive nominal damages of

¶1. To the extent that the Thurbers proved excessive maintenance of the Main Drive, the court had already addressed it.

- *Relocation and forfeiture of the Main Drive Easement.* The Brinkerhoffs were not required to relocate the easement and hadn't so abused the easement as to warrant forfeiture of their rights to it.

¶ 12    After the court issued its post-trial order, the parties appointed three experts to resolve the ongoing maintenance issues on the Main Drive, as directed by the order. Those experts issued an opinion, which the parties filed with the court, and the court confirmed it, finding that the appointment and the report "followed the process ordered by the [c]ourt." The court noted only that "[i]f an opinion or recommendation of the experts conflicts with the terms and limitations of [the court's post-trial order], the terms and limitations of the [o]rder shall prevail."

¶ 13    The Brinkerhoffs and the Thurbers both appeal various aspects of the court's post-trial order.

## II.     Standard of Review

We review a judgment following a bench trial as a mixed question of law and fact. *Premier Members Fed. Credit Union v. Block*, 2013 COA 128, ¶ 27. We review the trial court's legal conclusions de novo, but we defer to the court's factual findings unless they are clearly erroneous, meaning they have no support in the record. *Id.*; *see also Gravina Siding & Windows Co. v. Gravina*, 2022 COA 50, ¶ 14. When the evidence on a factual question is conflicting, we "may not substitute [our] conclusions for those of the trial court merely because there may be credible evidence supporting a different result." *Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008).

## III.     Analysis

We first address the Thurbers' arguments and then the Brinkerhoffs' arguments.[2]

---

[2] To the extent that the Thurbers or the Brinkerhoffs raise any additional arguments other than those addressed in this opinion, we decline to consider the arguments as insufficiently developed in the briefs. *See Doe 1 v. Colo. Dep't of Pub. Health & Env't*, 2018 COA 106, ¶ 60, *aff'd*, 2019 CO 92.

## A. The Thurbers' Arguments

¶ 16 The Thurbers first contend, based on several theories, that the trial court erred in concluding that the Northern Drive Easement hadn't replaced the Main Drive Easement. They also contend that the trial court impermissibly delegated judicial authority regarding maintenance of the Main Drive. Finally, they contend that the trial court erred by denying their trespass and nuisance claims. We address each of their contentions in turn.

### 1. Grounds for Establishing the Northern Drive Easement in Place of the Main Drive Easement

¶ 17 The Thurbers contend that the trial court should've concluded that the Northern Drive Easement had replaced the Main Drive Easement for five reasons: (1) the Brinkerhoffs breached the settlement agreement, (2) the Ewings validly granted the Northern Drive Easement to the Brinkerhoffs through a writing they executed in 2014, (3) the Northern Drive Easement should be created as an easement by estoppel, (4) judicial estoppel should prevent the Brinkerhoffs and JPD from taking the position that their properties aren't burdened by the Northern Drive Easement, and (5) the Main Drive Easement should be relocated to the location of the Northern

Drive or forfeited. We first provide some additional background and then address each of these contentions in turn.

### a. Additional Background

¶ 18    The settlement agreement expressly provided that the Thurbers' and Brinkerhoffs' performance under the agreement was "contingent and conditioned upon completion of each and all of" seven conditions. It further provided the following:

> The Thurbers and Brinkerhoffs understand and agree that it may not be possible to satisfy one or more of the contingencies/conditions required . . . , and in the event all and each of those contingencies/conditions are not met, for whatever reason, the terms of this Agreement to which [the] Thurbers and Brinkerhoffs have agreed may not be viable. Neither the Brinkerhoffs nor the Thurbers shall be bound to any of the terms or provisions set forth [in the agreement] unless and until all of the contingencies and conditions . . . are satisfied in full or are otherwise obtained in a manner satisfactory to both [the] Thurbers and [the] Brinkerhoffs. However, the Thurbers and the Brinkerhoffs shall be bound to employ their best efforts in obtaining the satisfaction or assurance of such assumptions and conditions.

One of the required conditions was "[t]he Ewings' cooperation in granting the Northern [Drive] Easement crossing their property."

¶ 19    Although it wasn't required by the settlement agreement, Mr. Ewing insisted that the documents creating the Northern Drive Easement and those abandoning the Main Drive Easement be executed simultaneously.  The Ewings formalized a document to create the Northern Drive Easement in late 2014 (the Ewing Easement Grant).  The parties also prepared documents for the abandonment of the Main Drive Easement.  But the Ewing Easement Grant was never delivered, the abandonment documents were never executed, and the Northern Drive was never constructed.

¶ 20    In mid-2020, after being joined as a party to this case, JPD served Ms. Ewing with a subpoena to produce documents.  Among the responsive documents Ms. Ewing produced were some emails she received from Ms. Thurber and from the Thurbers' attorney in February 2016, before JPD purchased the middle Ewing parcel in August 2017.  The emails indicated that Ms. Thurber and the Thurbers' attorney understood as early as February 2016 that Mr. Ewing believed the deal was "dead" and no longer planned to cooperate in creating the Northern Drive Easement.  Those emails

had not previously been produced — at least, not in unredacted form — in the lawsuit.

¶ 21    After the revelation of these emails and the presentation of further evidence, the trial court reversed course on its initial conclusion regarding the viability of the settlement agreement. In its post-trial order after the 2022 trial, it stated that, while "determining the exact date [was] non-productive[,] [t]he totality of the circumstances" established that the settlement agreement had failed before JPD purchased the middle parcel.

b.    Breach of the Settlement Agreement

¶ 22    The Thurbers first argue that the trial court erred in finding that the Brinkerhoffs hadn't breached the settlement agreement by preventing the occurrence of a condition precedent. We disagree.

¶ 23    "A condition precedent is '[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.'" *Soicher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 46, ¶ 22 (alteration in original) (quoting Black's Law Dictionary 355 (10th ed. 2014)). Conditions precedent are disfavored and thus are given effect only if they are established by clear and unequivocal

11

language.  *Dinnerware Plus Holdings, Inc. v. Silverthorne Factory Stores, LLC*, 128 P.3d 245, 247 (Colo. App. 2004).

¶ 24   Under the prevention doctrine, a condition may be waived or excused if a promisor prevents or hinders the fulfillment of a condition to their performance.  *New Design Constr. Co., Inc. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1184 (Colo. App. 2008).

¶ 25   The Thurbers contend that the Brinkerhoffs prevented the Ewings' cooperation from occurring by (1) failing to execute an abandonment document for the Main Drive Easement in 2014, after the Ewings had executed the Ewing Easement Grant, and (2) "killing" the deal by expressing a belief in October 2015 that the settlement agreement had already failed.

¶ 26   The trial court found, however, that the Brinkerhoffs hadn't prevented the Ewings' cooperation.  Instead, the court found that the settlement agreement had failed on its own at some point before JPD purchased the middle Ewing parcel.  This finding is supported by the record.

¶ 27   The court reasoned, in part, "The Brinkerhoffs could not be expected to give up their access via the Main Drive without having the Northern Drive in place and available to them, or even during

an extended period of construction." The court also relied largely on the Thurbers' concealment of Mr. Ewing's declaration in February 2016 that the deal was dead.

¶ 28 While the Thurbers cite evidence and arguments supporting their view that the Brinkerhoffs effectively killed the deal before February 2016, the trial court had ample evidence before it suggesting that the Brinkerhoffs didn't prevent or hinder the Ewings' cooperation and that Mr. Ewing had already decided in mid-2015 not to move forward with the deal. For instance, the court heard evidence that the Brinkerhoffs took substantial steps early on toward completing the deal, including retaining attorneys to draft documents creating the Northern Drive Easement and abandoning the Main Drive Easement, repeatedly sending drafts to the Thurbers' attorney, and eventually receiving a new draft back from the Thurbers' attorney in a form that was unacceptable to them. The court also heard evidence that Mr. Ewing told Mr. Brinkerhoff sometime shortly after he filed for divorce in May 2015 that he no longer planned to go through with the deal due to his pending divorce and property division.

¶ 29    As the trial court recognized, the proposed property division in the Ewings' divorce proceedings would eventually leave Ms. Ewing with the part of the property that was burdened by the existing Main Drive Easement and would have the couple sell the part of the property that would be burdened by the planned Northern Drive Easement, thus reducing its value.  Consequently, as the divorce proceedings progressed, Mr. Ewing had no incentive to move forward with the deal to replace the Main Drive Easement with the Northern Drive Easement.

¶ 30    Accordingly, we discern no clear error in the trial court's finding and decline to disturb it.  *See Premier Members*, ¶ 27; *Lawry*, 192 P.3d at 558.

### c.    Ewing Easement Grant

¶ 31    Next, the Thurbers argue that the trial court erred by determining that the Ewing Easement Grant was ineffective to grant the Northern Drive Easement to the Brinkerhoffs.  We disagree.

¶ 32    The trial court cited two reasons for concluding that the Ewing Easement Grant was ineffective: (1) it didn't comply with the statute of frauds and (2) it wasn't delivered to the Brinkerhoffs.  The Thurbers challenge both stated reasons.

14

¶ 33    We agree with the Thurbers that the trial court's reliance on the statute of frauds was erroneous.  It is true that, under the statute of frauds, contracts creating easements generally "must be in writing," *Schreck v. T & C Sanderson Farms, Inc.*, 37 P.3d 510, 513 (Colo. App. 2001); "must contain the names of the parties, the terms and conditions, a description of the interest or property, and the consideration," *id.*; and must be "subscribed by the party" granting the easement, § 38-10-108, C.R.S. 2024.  *See also Lobato v. Taylor*, 71 P.3d 938, 950 (Colo. 2002) (easements are subject to the statute of frauds).  But the Ewing Easement Grant does just this: it is a writing; it contains the parties' names, the terms and conditions, a description of the interest, and the consideration; and it bears the signatures of the grantors (the Ewings).

¶ 34    However, we reject the Thurbers' challenge to the trial court's reliance on the failure of delivery.

¶ 35    An easement is a right conferred by grant, prescription, or necessity authorizing someone to do or maintain something on someone else's land although it may burden that land.  *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1234 (Colo. 1998).  At issue here is a claimed easement by grant.

15

¶ 36     For a grant of an interest in land to be effective, the instrument creating the grant must be delivered to and accepted by the grantee — here, the Brinkerhoffs.  *See Tuttle v. Burrows*, 852 P.2d 1314, 1316 (Colo. App. 1992).  "Delivery requires proof that the grantor parted with possession and control or any power over the deed, for the benefit of [the] grantee, and that [the grantor] intended to do so presently and unconditionally."  *Sims v. Sperry*, 835 P.2d 565, 568 (Colo. App. 1992) (emphasis omitted).

¶ 37     The trial court's finding that the Ewing Easement Grant was never delivered to the Brinkerhoffs is not clearly erroneous, as it is supported by the record.  Indeed, the Thurbers don't point to any evidence indicating otherwise.  *See Premier Members*, ¶ 27.

¶ 38     We also reject the Thurbers' argument that part performance renders the Ewing Easement Grant enforceable.  The Thurbers haven't cited, and we haven't found, any authority suggesting that merely executing a document that would create an easement and having discussions about the easement terms and boundaries is sufficient to make the document binding — particularly where, as here, the grantors refrained from delivering the document and

16

communicated their intent that they would not be bound by it until other documents abandoning a related interest were executed.

#### d. Easement by Estoppel

¶ 39 Next, the Thurbers argue that the trial court erred by declining to imply the Northern Drive Easement as an easement by estoppel. Again, we disagree.

¶ 40 Generally, an easement is created when a grantor enters into a contract or makes a conveyance intended to create a servitude that complies with the statute of frauds. *Lobato*, 71 P.3d at 950. But implied easements may be created without contracts or conveyances. *Id.* One type of implied easement — an easement by estoppel — may be created when (1) "the owner of the servient [or burdened] estate 'permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked,' (2) the user substantially changed position in reasonable reliance on that belief, and (3) injustice can be avoided only by establishment of a servitude." *Id.* at 950-51 (quoting Restatement (Third) of Prop.: Servitudes § 2.10 (Am. L. Inst. 2000)).

¶ 41 "An easement by estoppel is an equitable remedy." *Id.* at 951. As such, we won't disturb a trial court's decision whether to grant such a remedy absent an abuse of discretion. *See Bolinger v. Neal*, 259 P.3d 1259, 1268 (Colo. App. 2010). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or is based on an erroneous understanding or application of the law. *Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 29.

¶ 42 We discern no abuse of the trial court's discretion.

¶ 43 The Thurbers note that the trial court previously found that there was at least an implied oral easement. However, they don't mention that, after learning of the hidden emails indicating Mr. Ewing's unwillingness to move forward with the deal, the court retracted this finding, remarking, "[A]lthough the [c]ourt previously indicated that there was an implied oral easement over the Ewing land, the [c]ourt was not advised of all the facts and . . . certain facts were actively concealed by or on behalf of the Thurbers."

¶ 44 The Thurbers also argue that an easement by estoppel exists based on their engagement in settlement discussions and execution of the settlement agreement, their agreement with the Ewings in principle on the exchange of the Main Drive Easement for the

Northern Drive Easement, the Ewings' execution of the Ewing Easement Grant, the parties' discussions about where the Northern Drive Easement would be located, and the parties' staking out of the middle line of that easement.

¶ 45    The trial court didn't abuse its discretion by determining otherwise.  The court's decision wasn't manifestly arbitrary, unreasonable, or unfair.  And we find no suggestion of an erroneous understanding or application of the law when the court concluded that (1) the Ewings didn't permit the use of their land in such a way as to make it reasonable to foresee the Thurbers substantially changing their position based on a belief the permission wouldn't be revoked, (2) the Thurbers didn't substantially change their position in reasonable reliance on any such belief, and (3) injustice doesn't require the establishment of a servitude.  *See Gebert*, ¶ 29; *Lobato*, 71 P.3d at 950-51.  Indeed, the court was aware that the Ewings had communicated their intent that the Northern Drive Easement wouldn't be effective until the Main Drive Easement was formally abandoned.  And negotiating agreements, discussing details, and walking and staking the boundaries of a proposed easement don't signify a substantial change in position as much as an outlay of

time and money to construct a driveway would have. *See* Restatement (Third) of Prop.: Servitudes § 2.10 cmt. e ("Normally the change in position that triggers [an easement by estoppel] is an investment in improvements either to the servient estate or to other land of the investor."); *Lobato*, 71 P.3d at 955 (moving onto the subject land and establishing permanent farms on it established a substantial change in position).

### e.     Judicial Estoppel

¶ 46     The Thurbers also argue that the trial court erred by failing to apply the doctrine of judicial estoppel to mandate the burdening of JPD's parcel with the Northern Drive Easement. Once again, we disagree.[3]

¶ 47     Judicial estoppel is "an equitable doctrine by which courts require parties to maintain a consistency of positions in the proceedings, assuring promotion of truth and preventing the parties from deliberately shifting positions to suit the exigencies of the moment." *Est. of Burford v. Burford*, 935 P.2d 943, 947 (Colo.

---

[3] We reject the Brinkerhoffs' and JPD's arguments that the Thurbers didn't preserve this issue. The Thurbers sufficiently raised the issue in the trial management order and their proposed findings of fact and conclusions of law.

1997).  This doctrine prevents a party from asserting inconsistent positions in the same or related litigation that could result in multiple recoveries for that party or could defeat their opponent's legitimate claim for recovery.  *Id.*

¶ 48     As it is an equitable remedy, we won't disturb a trial court's decision whether to apply judicial estoppel absent an abuse of discretion.  *See Bolinger*, 259 P.3d at 1268.

¶ 49     The Thurbers argue that, because the Brinkerhoffs initially pursued the creation of the Northern Drive Easement across the middle Ewing parcel, JPD, an entity the Brinkerhoffs wholly own, may not now object to it.  The Thurbers' argument relies on the premise that, because the Brinkerhoffs are the sole owners of JPD, JPD is essentially their alter ego.  Thus, they argue, JPD's taking of a different stance than the Brinkerhoffs previously did represents the Brinkerhoffs' assertion of inconsistent positions.

¶ 50     The trial court rejected this argument, declining to disregard JPD's status as a legal entity separate from the Brinkerhoffs.  The court noted that JPD legitimately purchased the middle Ewing parcel as part of a Section 1031 exchange and that burdening the

parcel with an easement would significantly impair its value and make it difficult to develop.[4]

¶ 51     We discern no abuse of discretion in this decision. *See Bolinger*, 259 P.3d at 1268. "A legal entity, such as an LLC, is separate from the members that own the entity," except in extraordinary circumstances, such as where a party satisfies the criteria to pierce the corporate veil. *Griffith v. SSC Pueblo Belmont Operating Co.*, 2016 CO 60M, ¶ 11. The Thurbers didn't attempt to pierce JPD's corporate veil. Thus, the trial court acted within its discretion in treating JPD as an entity separate from its owners.

       f.     Relocation or Forfeiture of the Main Drive Easement

¶ 52     The Thurbers' final argument concerning the establishment of the Northern Drive Easement is that the trial court erred in determining that neither relocation nor forfeiture of the Main Drive was warranted. We disagree.

---

[4] The trial court was referring to a provision of the United States Tax Code, 26 U.S.C. § 1031, which permits taxpayers to defer the capital gains taxes associated with the sale of real property by reinvesting the proceeds in a replacement property. The trial court heard evidence that JPD invests in real estate and purchased the middle Ewing parcel after selling another property.

22

¶ 53    A burdened property owner generally may relocate an easement to maximize the use of their property, so long as the relocation doesn't damage the benefited estate. *Sinclair Transp. Co. v. Sandberg*, 2014 COA 76M, ¶ 56. However, they cannot unilaterally move the easement if "it is specified in deeds or otherwise to have a location certain." *Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229, 1236 (Colo. 2001) (citing Restatement (Third) of Prop.: Servitudes § 4.8(3) (Am. L. Inst. 2000)).

¶ 54    Additionally, an easement may be forfeited if the dominant estate holder misuses it, causing damage to the servient estate. *Isenberg v. Woitchek*, 356 P.2d 904, 908 (Colo. 1960). While the holder of the dominant estate generally may use an easement "for any purpose to which the dominant estate may then, or in the future, reasonably be devoted," they risk forfeiting an easement if they use it in a way "different from that established at the time of its creation, which imposes an additional burden upon the servient estate." *Westland Nursing Home, Inc. v. Benson*, 517 P.2d 862, 867 (Colo. App. 1974) (citation omitted). Still, forfeiture of property rights is disfavored, *Wilson v. Prentiss*, 140 P.3d 288, 292 (Colo. App. 2006), and a court may decline to order forfeiture absent

23

evidence that actual damage resulted from any misuse, *see Isenberg*, 356 P.2d at 908.

¶ 55    As to relocation, the Thurbers argue that the Brinkerhoffs had already consented to moving the easement from the Main Drive to the Northern Drive; thus, they were precluded from claiming the relocation of the easement would damage them.  Moreover, the Thurbers argue, there wouldn't be any damage because the new route would be similar to and wouldn't take much longer to traverse than the existing route.  But the location of the Main Drive Easement is specified in the deeds creating the easement, thus precluding the Thurbers' unilateral relocation of the easement.  *See Roaring Fork Club*, 36 P.3d at 1236; Restatement (Third) of Prop: Servitudes § 4.8(3).  Moreover, even if the Brinkerhoffs at one time agreed to move the easement as part of a settlement agreement that fell through, that doesn't mean that such a move wouldn't cause them damage.  *See Sinclair Transp. Co.,* ¶ 56.  And, at any rate, the Thurbers can't unilaterally relocate that portion of the existing easement that traverses the southern Ewing parcel they now own to the middle Ewing parcel now owned by JPD (which, as we've stated,

24

is a distinct entity and must be treated separately from the Brinkerhoffs).[5]

¶ 56 As to forfeiture, the Thurbers contend that the Brinkerhoffs' excessive use and maintenance of the Main Drive and consistent failure to close the gates along the drive constituted misuse warranting forfeiture. The trial court, however, found that the Thurbers had presented minimal evidence of misuse and that "the Brinkerhoffs have not abused the easement to such an extent as necessary to consider" forfeiture of the Main Drive. Given that these findings are supported by ample evidence presented at trial concerning the use and maintenance of the driveway, we discern no error in the findings and decline to disturb them. *See Premier Members*, ¶ 27; *Lawry*, 192 P.3d at 558.

---

[5] The fact that JPD had notice of the parties' easement disputes at the time it acquired the property is irrelevant. The Thurbers cite no case law — and we are aware of none — suggesting that an easement can be moved onto another owner's property simply because that owner was aware of a dispute concerning the easement before its purchase of the property.

## 2. Impermissible Delegation of Authority

¶ 57 The Thurbers next argue that the trial court impermissibly delegated authority regarding maintenance of the Main Drive to the panel of experts. We agree.

¶ 58 "[C]ourts cannot delegate their judicial duties." *Sapero v. State Bd. of Med. Exam'rs*, 11 P.2d 555, 577 (Colo. 1932). More specifically, courts may not abdicate their responsibilities and duties by delegating decision-making authority to others. *Gelfond v. Dist. Ct.*, 504 P.2d 673, 675 (Colo. 1972); *see also Haverly Invincible Mining Co. v. Howcutt*, 6 Colo. 574, 575 (1883) (a judge cannot appoint another person to perform the judge's duties, even if the parties consent to that appointment).

¶ 59 This question presents an issue of law, which we review de novo. *See Amica Life Ins. Co. v. Wertz*, 2020 CO 29, ¶ 16.

¶ 60 The parties dispute whether, in directing the parties to turn to a panel of experts to provide a binding recommendation regarding future maintenance of the Main Drive, the court was relying on C.R.C.P. 53, which governs special masters, or CRE 706, which governs court-appointed experts.

¶ 61     We need not decide which rule applies, however, because we

conclude that, in either event, the trial court impermissibly

delegated its decision-making authority by making the expert

panel's recommendation binding on the parties.

¶ 62     The trial court directed the panel of experts to make a "binding

recommendation" regarding the ongoing maintenance of the Main

Drive. While the court indicated that its post-trial order would

prevail over any conflicting expert recommendations, it nevertheless

directed the parties to follow all recommendations that fell within

that limitation. And when the parties later presented the experts'

recommendations to the court, it summarily adopted them in an

order that didn't include any substantive review.

¶ 63     We conclude that, because the ultimate decision on future

maintenance of the Main Drive was made by the panel of experts,

not by the trial court, the court impermissibly delegated its

decision-making authority to the experts. *See Gelfond*, 504 P.2d at

675. We therefore reverse the portion of the court's post-trial order

directing the panel of experts to make a "binding recommendation"

regarding future maintenance of the Main Drive, and we declare

null and void the court's later order adopting the experts'

27

recommendation.  We also remand the case to the trial court to make its own determination of the maintenance issues, with or without the assistance of experts.

### 3. Trespass and Nuisance Claims

¶ 64 Finally, the Thurbers contend that the trial court erred by finding against them on their claims for trespass and nuisance.  We are not persuaded.

### a. Trespass

¶ 65 We discern no clear error in the trial court's findings on the Thurbers' trespass claim.

¶ 66 Trespass is a physical intrusion on another landowner's property without their permission.  *Blakeland Drive Invs., LLP IV v. Taghavi*, 2023 COA 30M, ¶ 15.  The intrusion can occur when an actor intentionally enters someone else's land or when an actor causes something else to enter the land.  *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003).  "For instance, an 'actor, without . . . entering the land, may invade another's interest in its exclusive possession by . . . placing a thing either on or beneath the surface of the land.'"  *Id.* (quoting Restatement (Second) of Torts §§ 158(a) cmt. i, 159(1) (Am. L. Inst. 1965)).  "A landowner who sets in motion

28

a force which, in the usual course of events, will damage property of another is guilty of a trespass on such property." *Id.*; *see also Miller v. Carnation Co.*, 516 P.2d 661, 664 (Colo. App. 1973) (a failure to remove chicken manure from chicken houses, resulting in the multiplication of flies that intruded onto a neighbor's property, was sufficient to establish trespass).

¶ 67 The Thurber's trespass claim was premised on two theories. First, they complained about the Brinkerhoffs' alleged overuse and aggressive maintenance of the Main Drive, as well as their mastication under a United States Forest Service agreement.[6] The Thurbers claimed that these activities caused soil, grass, snow, and road base to wash down onto their property, damaging their pasture and filling in culverts and cattle guards. And second, the Thurbers claimed that the Brinkerhoffs trespassed on a claimed

---

[6] Mastication involves grinding, shredding, and chopping trees and shrubs into small pieces in an effort to prepare a site for new growth, help control prescribed fires, and reduce the spread of wildfires. *See* Theresa Jain et al., U.S. Dep't of Agric., RMRS-GTR-381, *To Masticate or Not: Useful Tips for Treating Forest, Woodland, and Shrubland Vegetation*, at 1 (2018), https://perma.cc/XDA7-NEA4.

easement (the NWG Easement, discussed *infra* Part III.B.1) despite having no right to use it.

¶ 68 As to the first theory, the trial court found that although the Thurbers had shown some filling in of their cattle guards, suggesting excessive road maintenance, they hadn't proven their claim and would need expert evidence to establish liability for trespass. We discern no clear error in this finding. Given the parties' conflicting positions as to what may have flowed onto the Thurbers' property, whether such material resulted from the Brinkerhoffs' activities, and whether such material caused any harm, it was within the trial court's province to find the claim hadn't been established with sufficient certainty. *See Premier Members*, ¶ 27. And contrary to the Thurbers' contention, the trial court didn't rule that expert testimony was required to establish this kind of claim — only that, in the absence of expert testimony, the court wasn't convinced that a trespass had occurred.

¶ 69 As to the second theory, the court found that, at most, the Thurbers proved that the Brinkerhoffs' car had traveled on the NWG Easement, and it awarded the Thurbers nominal damages of $1 for that trespass. Thus, contrary to the Thurbers' suggestion, the

court didn't rule against them on this theory; it just didn't find any damages.  We discern no clear error in that finding.  *See id.*

### b.  Nuisance

¶ 70  We decline to review the Thurbers' challenge regarding the nuisance claim due to their waiver of the issue.

¶ 71  Although the trial court summarily denied "any claim for nuisance" in its post-trial order, the Thurbers had already stipulated to the dismissal of their nuisance claim under C.R.C.P. 41 before trial.  While the Thurbers note that the trial management order referred to this claim, the draft order was apparently submitted to the court before the C.R.C.P. 41 dismissal of the nuisance claim.  And there is no reference to a nuisance claim in the Thurbers' proposed findings of fact and conclusions of law.

¶ 72  Therefore, the Thurbers waived any claim for nuisance, and we decline to consider arguments regarding that claim on appeal.  *See People in Interest of A.V.*, 2018 COA 138M, ¶ 13 (a party waives an issue when they specifically remove it from the trial court's consideration, and we may not review a waived issue on appeal).

## B. The Brinkerhoffs' Arguments

¶ 73 In their cross-appeal, the Brinkerhoffs contend that the trial court erred by (1) determining they don't have an interest in the Pasture Easement and (2) allowing the Thurbers to maintain gates on the Main Drive Easement. We address each contention in turn.

### 1. Pasture Easement

¶ 74 The Brinkerhoffs argue that the trial court erred in concluding that they have no interest in the Pasture Easement. We disagree.

#### a. Additional Background

¶ 75 Although this issue pertains to only one easement — the Pasture Easement — the parties' arguments and the trial court's reasoning overlap with issues concerning another easement — the NWG Easement — not at issue in this appeal.

¶ 76 Diana P. Braden originally owned all of the relevant property. In 1994, she sold portions of or interests in it to three buyer groups. The Brinkerhoffs and Edward J. and Karen A. Novotny purchased parcels in fee. And Tri-B Associates, LLP and North Washington Property Investment Corporation purchased an easement — referred to as the North Washington Group, or NWG, Easement (though sometimes referred to as the NWD Easement) — to access

their property, which was adjacent to the parcel purchased by the Novotnys. Part of that easement passed over the Novotnys' parcel.

¶ 77 Ms. Braden later sold other parcels over which the NWG Easement passed to three buyer groups — the Ewings, the Thurbers, and the Brinkerhoffs (who purchased a second parcel, referred to as the conservation parcel, adjacent to the one they'd bought in 1994). The three conveyances reserved to Ms. Braden an easement over the Main Drive but not over the NWG Easement. The Thurbers also purchased the Novotnys' parcel.

¶ 78 At an earlier stage in this litigation, the Brinkerhoffs asserted that they had a right to use the NWG Easement passing over the Thurbers' property to reach the conservation parcel. In *Thurber v. Brinkerhoff*, (Colo. App. No. 14CA1623, Dec. 1, 2016) (not published pursuant to C.A.R. 35(e)), a division of this court rejected that argument, concluding that the Brinkerhoffs had no such right because Ms. Braden hadn't reserved any right to the NWG Easement in her various transfers of property; thus, she didn't have an interest in that easement at the time she conveyed the conservation parcel to the Brinkerhoffs. *See id.* at ¶¶ 29-40.

¶ 79    In 1994, Ms. Braden also attempted to convey to the Brinkerhoffs a different easement, called the Pasture Easement, which would provide another means of accessing their property from the public road.  The western part of the Pasture Easement was to run along the same path as the NWG Easement, then it would diverge from the NWG Easement and run northeast toward the Brinkerhoffs' property.

¶ 80    Although the parties raised different issues relating to the two easements at trial, the trial court at times referred to the two interchangeably in its post-trial order.  In a later order, the court — at that point, a different judge, following the original judge's retirement — expressed an understanding that the two easements were the same and restated one of the earlier findings to provide that "the Brinkerhoffs have no interest in the NWG Drive, also known as the 'Pasture Easement.'"  Later, however, the court entered a corrected order rescinding the restated finding, acknowledging that the two easements were different, and noting that the Brinkerhoffs had no interest in either easement.

## b. Rights in the Pasture Easement

¶ 81 Although the trial court gave a few reasons for concluding that the Brinkerhoffs didn't have an interest in the Pasture Easement, we affirm its decision for one reason alone: the Novotnys, as the predecessors-in-interest to the Thurbers, didn't have any notice of the easement at the time they acquired their property interest. *See Million v. Grasse*, 2024 COA 22, ¶ 29 (we may affirm a trial court's judgment on any basis supported by the record).

¶ 82 The existence of an expressly created easement is determined by interpreting the conveyance instrument, which we do de novo. *Gold Hill Dev. Co., L.P. v. TSG Ski & Golf, LLC*, 2015 COA 177, ¶ 43.

¶ 83 An easement may be created by reservation in a deed conveying the servient property to another person. *Friends of the Black Forest Reg'l Park, Inc. v. Bd. of Cnty. Comm'rs*, 80 P.3d 871, 879 (Colo. App. 2003). Although no particular words are required to grant an easement, the instrument must identify with reasonable certainty the easement created and the dominant and servient tenements. *Hornsilver Circle, Ltd. v. Trope*, 904 P.2d 1353, 1356 (Colo. App. 1995).

¶ 84    Ms. Braden conveyed the initial parcel to the Novotnys on July 11, 1994.[7] In that deed, Ms. Braden reserved what would become the Main Drive Easement. She didn't reserve any other easement in the deed. On the same day, Ms. Braden executed another instrument granting the Pasture Easement to the Brinkerhoffs.

¶ 85    Colorado has a "race-notice" recording statute, such that "unrecorded instruments or documents are generally not valid against persons with rights in or to such real property who first record and those holding rights under such persons." *Ranch O, LLC v. Colo. Cattlemen's Agric. Land Tr.*, 2015 COA 20, ¶ 30; *see also* § 38-35-109, C.R.S. 2024.

¶ 86    The statute makes an exception, though, if a person has notice of a claimed interest before they acquire their rights in the property. *Ranch O*, ¶ 30. Three forms of notice are recognized: actual notice, constructive notice, and inquiry notice. *Franklin Bank, N.A. v. Bowling*, 74 P.3d 308, 313 (Colo. 2003). Actual notice occurs when

---

[7] The Brinkerhoffs suggest that this conveyance was initially invalid under then-existing law. But they don't develop this argument in their opening brief. Nor does it appear that they argued it to the trial court. Therefore, we don't consider it. *See Doe 1*, ¶ 60; *Good Life Colo., LLC v. WLCO, LLC*, 2025 COA 8M, ¶ 31 (we don't consider issues not preserved in the trial court).

a person has actual knowledge of another's claim. *Id.* Constructive notice is essentially record notice: when someone properly records their interest in property, they constructively notify "all the world" of their claim, and the law assumes that all future grantees will search the index and discover the claim. *Id.* And inquiry notice arises when a person becomes or should've become aware of facts that, if investigated, would reveal another's claim, in which case they are charged with all knowledge that a reasonable investigation would've revealed. *Id.*

¶ 87 While Ms. Braden conveyed the Novotnys' parcel and granted the Pasture Easement on the same day (July 11, 1994), the Novotnys recorded their instrument first — they recorded their interest on July 19, 1994, whereas the Brinkerhoffs recorded their interest two days later, on July 21, 1994. Thus, the Novotnys had no constructive notice of Pasture Easement. And the Brinkerhoffs don't offer any reason why the Novotnys would've had inquiry notice either. So the Novotnys could've taken their parcel subject to the Pasture Easement only if they had actual notice of it. *See id.*

¶ 88 But the trial court found that the Novotnys had no actual notice of the easement at the time they acquired their interest. To

be sure, this issue was hotly contested at trial, and the Brinkerhoffs cited evidence that could've supported a contrary finding. But the court rejected their evidence, finding that "[Ms.] Novotny was more credible than the Brinkerhoffs on the issue of a pasture easement being meaningfully discussed or in any manner approaching a granting of such pasture easement." Because there is evidence supporting the trial court's finding, we must affirm it. *See Premier Members*, ¶ 27; *Lawry*, 192 P.3d at 558.[8]

¶ 89    Because the Novotnys took the property with no notice of the Pasture Easement, their purchase wasn't subject to that easement. Consequently, when the Thurbers later purchased the property from the Novotnys, it was unburdened by the easement. The Brinkerhoffs nonetheless argue that the Thurbers took the property with knowledge of the claimed easement and, therefore, that their interest is subject to the easement. But the Thurbers took the same property interest the Novotnys had — which was not subject to the easement. *See Overland Mach. Co. v. Alpenfels*, 69 P. 574,

---

[8] The Brinkerhoffs, in fact, concede this point, acknowledging that "clear error cannot be shown" on the trial court's findings regarding the Novotnys' notice.

575 (Colo. 1902) ("[O]ne is presumed to convey the highest estate he owns in the lands granted, unless a smaller estate is described.") (citation omitted); *Ranch O*, ¶ 30 (unrecorded instruments are invalid not just against persons with rights to the property that are first recorded but also "those holding rights under such persons"). And any notice the Thurbers had of an attempt by a former owner to create an easement would at that point have no effect, as the former owner would then have no property interest to convey. *See Better Baked, LLC v. GJG Prop., LLC*, 2020 COA 51, ¶ 33 (a party can challenge an instrument purporting to grant an interest in property if the grantor had no interest in the property to convey).

### 2. Gates on the Main Drive

¶ 90 Lastly, the Brinkerhoffs argue that the trial court erred by permitting the Thurbers to maintain gates along the Main Drive. We disagree.

¶ 91 The owner of land burdened by an easement has a qualified right to put their property to any lawful use. *Lazy Dog Ranch v. Telluray Ranch Corp.*, 923 P.2d 313, 316 (Colo. App. 1996). However, they cannot unreasonably interfere with the superior right of the holder of the easement. *Id.*

¶ 92 Whether gates are an unreasonable interference to an easement holder is a factual question. *Id.* at 317; *see also Schold v. Sawyer*, 944 P.2d 683, 685 (Colo. App. 1997) ("[W]hat may be considered a proper use by the servient owner is a question of fact."). We won't disturb the trial court's findings if they are supported by the evidence. *Lazy Dog Ranch*, 923 P.2d at 317.

¶ 93 When the grant is silent on the issue, a court should consider four nonexclusive factors in deciding whether gates unreasonably interfere with an easement: (1) the purpose for which the grant was made, (2) the parties' intention given the circumstances surrounding the grant, (3) the nature and situation of the property, and (4) the manner in which the easement is used. *Id.*

¶ 94 In applying these factors to the facts of this case, the trial court first discussed that the primary purpose of the Main Drive Easement was to allow the Brinkerhoffs access from the public road to the parcel where their house is situated. The court also recognized that when Ms. Braden owned the land, she used the entire area for ranching and that the Thurbers intended to continue some limited ranching operations. The court further noted that the property is rural and is zoned consistent with ranching. Finally,

the court found "ample evidence" that the Thurbers use the land for limited agricultural purposes and at least intermittently keep livestock. Based on these factors, the court determined that "the Thurbers may maintain the gates that are currently in place and the cattle guards currently in place as well, to facilitate the continuation of their limited ranching operation."

¶ 95 However, the court established some limitations to balance the parties' interests and minimize the burdens on the Brinkerhoffs. For instance, the court ordered the Thurbers to provide the Brinkerhoffs with at least four working remote controls and to ensure that the gates can be activated manually with a button. The court also directed that the gates remain open during any times the Thurbers are not using their property for ranching operations.

¶ 96 We discern no clear error in the trial court's findings, which are amply supported by the record. *See id.* The Brinkerhoffs argue that the trial court failed to find that the gates were actually necessary — but that fact is implicit in its order, and, at any rate, the court directed that the gates be kept open when the Thurbers aren't conducting ranching operations on their property (in other words, when the gates aren't needed to aid ranching operations).

And while the Brinkerhoffs point to other evidence that could've supported their position that any use of gates was unreasonable or could've supported additional limitations on the use of gates, it is not our role to reassess those facts or substitute our own findings for those of the trial court. *See id.*; *see also Lawry*, 192 P.3d at 558. Nor is it our role to second-guess the trial court's allowance of locked gates — particularly given that the gates aren't padlocked, *cf. Lazy Dog Ranch*, 923 P.2d at 316-17, but can simply be opened with remotes or a button. And we don't second-guess the court's approval of the existing gates, notwithstanding that they are slightly narrower than the maximum width of the driveway.

## IV. Appellate Attorney Fees and Costs

¶ 97 Finally, we deny JPD's request for attorney fees pursuant to section 13-17-102(4), C.R.S. 2024, and C.A.R. 39.1 on the basis that the Thurbers' appeal lacks substantial justification.

¶ 98 As an initial matter, we note that JPD's request doesn't comply with C.A.R. 39.1, which requires a request for appellate attorney fees to be set out "under a separate heading."

¶ 99 At any rate, we don't find that an award of such fees is warranted. Under section 13-17-102(4), a court may assess fees if

42

it finds that a "party brought or defended an action, or any part of an action, that lacked substantial justification." "[A]n appeal 'lacks substantial justification' and is 'substantially frivolous' under [section] 13-17-102(4) when the appellant's briefs fail to set forth, in a manner consistent with C.A.R. 28, a coherent assertion of error, supported by legal authority." *Castillo v. Koppes-Conway*, 148 P.3d 289, 292 (Colo. App. 2006). We conclude that the Thurbers' appeal doesn't lack substantial justification. They presented coherent arguments supported by legal authority and citations to the record, and they prevailed on one of those arguments.

¶ 100    Because JPD only partially prevailed in its defense of the Thurbers' appeal, costs may be taxed only as ordered by the trial court on remand. *See* C.A.R. 39(a)(4).

## V.    Disposition

¶ 101    The judgment is reversed as to the trial court's directions concerning ongoing maintenance of the Main Drive. The judgment is affirmed in all other respects. The case is remanded for further proceedings consistent with this opinion.

JUDGE FOX and JUDGE LUM concur.